John DILLARD, et al., Plaintiffs,

v.

BALDWIN COUNTY BOARD OF
EDUCATION, Defendant.

Civ. A. No. 87–T–1158–N.

United States District Court,
M.D. Alabama, N.D.

April 8, 1988.

1460

James U. Blacksher, Mobile, Ala., Larry Menefee, Edward Still, Reeves & Still, Birmingham, Ala., Julius L. Chambers, Lani Guinier, Pamela Karlan, NAACP Legal Defense Fund, New York City, for plaintiffs.

Abram L. Philips, Jr., Reams, Vollmer, Philips, Killon, Brooks & Schell, Mobile, Ala., Norborne C. Stone, Jr., Blackburn, Stone, Granade, Crosby & Blackburn, Bay Minette, Ala., Don Siegelman, Atty. Gen., Susan Russ, Asst. Atty. Gen., David Boyd, Balch & Bingham, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This lawsuit is a challenge to the at-large system used to elect members of the Baldwin County Board of Education. This case is one among many, now pending in this court, challenging the at-large election systems and various features of those systems used by many cities, counties, and county school boards across Alabama. Here the plaintiff class, which includes all black citizens of Baldwin County, charges that the system used by the Baldwin County school board violates § 2 et seq. of the Voting Rights Act of 1965, as amended, 42 U.S.C. A. § 1973 et seq. A violation of § 2 is established if official action was taken or maintained with a racially discriminatory "intent" or the action has racially discriminatory "results," determined according to certain Congressionally approved criteria.[1] *McMillan v. Escambia County,* 748 F.2d 1037, 1046 (5th Cir.1984) (Former Fifth); *Buskey v. Oliver,* 565 F.Supp. 1473, 1481 & n. 18 (M.D.Ala.1983). As the Supreme Court recently stated, "Section 2 prohibits *all forms* of voting discrimination." *Thornburg v. Gingles,* 478 U.S. 30, 45 n. 10, 106 S.Ct. 2752, 2764 n. 10, 92 L.Ed.2d 25 (1986) (emphasis added).

Based on the evidence presented at a nonjury trial on March 14, 1988, the court concludes that the school board's election

---

1. Section 2, as amended, reads as follows:

    (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973 b(f)(2) of this title, as provided in subsection (b).

    (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or polit-

    ical subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

    42 U.S.C. § 1973.

system violates § 2 and that the plaintiff class is thus entitled to appropriate relief.

## I. PROCEDURAL BACKGROUND

This lawsuit is a spin-off of earlier proceedings in another case, *Dillard v. Crenshaw County,* civil action no. 85–T–1332–N, brought under § 2 to challenge the at-large schemes used to elect county commissioners in nine Alabama counties. *See* 640 F.Supp. 1347 (M.D.Ala.1986); 649 F.Supp. 289 (M.D.Ala.1986), *affirmed in part and remanded in part for reconsideration,* 831 F.2d 246 (11th Cir.1987), *reaffirmed on remand,* 679 F.Supp. 1546 (M.D.Ala.1988). There this court found the Alabama legislature guilty of intentional racial discrimination in fashioning and authorizing at-large election schemes for local jurisdictions. The plaintiffs established this discrimination in two ways. First, the evidence reflected that, for the purpose of minimizing black voting strength, the legislature reshaped local at-large election schemes by enacting "anti-single shot" laws in the 1950's and by replacing these laws in 1961 with "numbered place" laws. As the court wrote,

> These racially inspired numbered place laws exist and operate today.
>
> Therefore, regardless of the reasons for which the at-large systems were put into place in various counties, ... the numbered place laws have inevitably tainted these systems wherever they exist in the state. In adopting the laws, the state reshaped at-large systems into more secure mechanisms for discrimination. And as the evidence makes clear, this reshaping of the systems was completely intentional.

640 F.Supp. at 1357. Second, the evidence established that the legislature engaged in a century-long pattern and practice of switching between local at-large systems and local single-member district systems as needed to diminish black voting strength. As the court observed,

> the Alabama legislature ... has consistently enacted at-large systems for local governments during periods when there

was a substantial threat of black participation in the political process. This evidence, set against the background of the state's unrelenting and undisputed history of race discrimination, convinces the court that the enactment of the at-large systems during such periods was not adventitious but rather racially inspired.

*Id.* at 1361. The court went on to conclude that the legislature's racially motivated manipulation of laws governing at-large systems for local governments violated § 2 of the Voting Rights Act with respect to the counties then defending their election systems. Relief was eventually granted as to the nine counties either by settlement or with a court-ordered remedy. 649 F.Supp. at 291–92, 298–99; 679 F.Supp. at 1547.

The court later allowed the plaintiffs in *Crenshaw County* to expand their complaint to include 183 cities, counties, and county school boards that are currently using, or are subject to, at-large systems that are allegedly a product of, or tainted by, the racially inspired enactments of the Alabama legislature. All but seven, that is, 176, of these jurisdictions entered into an interim consent decree with the plaintiffs, agreeing to resolution of the plaintiffs' claims in this court and to certification of a plaintiff class of black residents of these jurisdictions.[2] The parties also agreed under the decree to division of the jurisdictions into three groups: Group A, those which contest both liability and remedy; Group B, those which admit liability but are unable to agree with the plaintiffs on a remedy; and Group C, those which have reached complete settlements with the plaintiffs. The parties also later agreed for the court to treat 165, or all but 18 of the total 183, jurisdictions as individual lawsuits, with separate files and civil action numbers. The Baldwin County Board of Education is one of the 165 jurisdictions that agreed to all of the above.

The school board was originally a member of Group C because it and counsel for plaintiffs agreed at the beginning of this litigation to a single-member district plan

2. The court later overruled the objections of these seven jurisdictions to inclusion in this lawsuit.

with five districts, of which one, according to the school board, would have a majority black population. Shortly after the settlement, however, black leaders in Baldwin County informed plaintiffs' counsel that he should not have accepted the settlement because it did not provide a "true" majority black district. After further investigation, plaintiffs' counsel informed the school board that he agreed with the local black leadership and that he would ask that the court not approve the settlement. Plaintiffs' counsel also proposed a seven-member plan, which he contends contains one effective majority-black district. The school board responded with a motion to enforce settlement. With the agreement of the parties, the court also transferred the school board from Group C to Group A. The school board is therefore contesting both liability and remedy, but is in the alternative asking that the court enforce its settlement with the plaintiffs.

## II. FACTUAL BACKGROUND

Baldwin County is located in the southwest part of Alabama, and is bordered in part by Mobile Bay to the west and Florida to the east. It has a population, according to the 1980 census, of 78,556 people; of that figure, 12,716, or 16.19%, are black, and 65,840, or 83.81%, are white. However, during this decade the county has experienced a population boom, with most of the boom being made up of whites. It is estimated that by 1990, the population will have increased to 98,820, with the white population having increased by 19,280 to 85,120 or 86.14% of the population, but with the black population having increased by only 984, to 13,700 and with a percentage point decrease to 13.86%.[3] Most of the black population is concentrated in neighborhoods on a strip along the county's western border.

## III. DISCRIMINATORY RESULTS

### A.

The plaintiffs rest their § 2 challenge against the school board on both discriminatory "intent" and "results." In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court set forth the manner in which a trial court should assess a § 2 results claim. The claim is established where the "totality of the circumstances," 42 U.S.C.A. § 1973(b), reveals that "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.* at 44, 106 S.Ct. at 2763, *quoting* S.Rep. No. 417, 97th Cong. 2nd Sess. 28, *reprinted in* 1982 U.S. Code Cong. & Ad.News, 177, 206 (hereinafter 1982 U.S.Code Cong.). Factors typically considered in evaluating the claim are: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political

---

**3.** These estimates are from the Alabama State Data Center and were not contested by the school board.

cal subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Id.,* 106 S.Ct. at 2759–60.

The *Thornburg* Court went on to observe that the compilation of these factors in premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representative." *Id.* at 47, 106 S.Ct. at 2764–65. These factors are, therefore, as previously noted by this court "neither comprehensive nor exclusive, and other factors may also be relevant and may be considered." *Crenshaw County,* 649 F.Supp. at 294.

The *Thornburg* Court further observed that there is one significant limit on a results claim. A minority group has no right under § 2 to proportional representation; "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Id.,* 478 U.S. at 46, 106 S.Ct. at 2764. Rather, as stated, the plaintiffs must show that, under the totality of circumstances, the challenged electoral scheme results in an unequal access to the electoral process.

### B.

The *Thornburg* Court then refined the above general observations to address the specific type of governmental decision being challenged: the decision of a government to employ, in the face of a majority-vote requirement, at-large districting rather than single-member districts with one or more majority black districts. *Id.* at 44, 106 S.Ct. at 2764. The Court held that while all the Congressional factors listed above remain relevant, two circumstances are more important, and indeed are essential, to success on this challenge. *Id.* at 47–52 & ns. 15 & 16, 106 S.Ct at 2765–67 & ns. 15 & 16.

The Court required, as a first "precondition" to such a challenge, that the minority must be able to show that it experiences substantial difficulty electing representatives of its choice. To do this it must show the existence of "racially polarized voting": that is, that the minority group constitutes a politically cohesive unit and that the white majority votes sufficiently as a block, usually to defeat the minority's preferred candidate. *Id.* at 50, 54, 106 S.Ct. at 2767, 2769. If the minority group is not politically cohesive, it cannot be said that distinctive minority group interests are being thwarted, *id.;* and without significant white bloc voting, usually to defeat minority preferences, it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. *Id.* at 48 n. 15, 106 S.Ct. at 2766 n. 15. Indeed, for these reasons, racially polarized voting is viewed as the key element of a vote dilution claim. *Id.* at 54, 106 S.Ct. at 2769.

It cannot also be overlooked that racially polarized voting not only deprives minority voters of their preferred representatives, it also leaves them effectively unrepresented because it allows those elected to ignore minority interest without fear of political consequences. *Id.* at 48 n. 14, 106 S.Ct. at 2765 n. 14. In a very real sense, therefore, racially polarized voting perpetuates the effects of past discrimination. *Id.* at 44 n. 9, 106 S.Ct. at 2763 n. 9.

The Court required, as a second precondition, that the minority be able to demonstrate that its difficulty in electing candidates of its choice is in some measure attributable to the challenged election feature, *id.* at 47, 106 S.Ct. at 2765, or, to put it another way, that the minority has the *potential* to elect representatives in the absence of the challenged feature. *Id.* at 50–51 & n. 17, 106 S.Ct. at 2766–67 & n. 17. Because the questioned choice in *Thornburg* was in the context of a majority vote requirement and because it was between an at-large system and a scheme with a majority black single-member district, the Court logically required that "the minority group ... be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 48, 106 S.Ct. at 2766. As the Court explained, "If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its

candidates." *Id.* (emphasis in original) (footnotes omitted). In effect, therefore, under *Thornburg* if a minority seeks to require that a jurisdiction with a majority vote requirement adopt single-member districts with one or more majority black districts, the minority must be able to show in the *liability* phase of its case that the remedy of a majority black single-member district is in actuality possible.[4]

### C.

The plaintiffs here make essentially the same type of results challenge made in *Thornburg*, and thus the *Thornburg* approach is fully applicable here. They contend that the Baldwin County Board of Education's use, in a majority-vote context, of at-large districting rather than single-member districts with at least one majority black district, violates § 2. The evidence supports the plaintiffs' claim.

### 1.

First of all, the precondition of racially polarized voting is satisfied. As previously stated, racially polarized voting has two aspects: whether the minority group is a politically cohesive unit and whether the white majority votes sufficiently as a bloc, usually to defeat the minority's preferred candidate. The existence of racially polarized voting therefore requires "discrete inquiries into minority and white voting practices." *Thornburg,* at 56, 106 S.Ct. at 2769. The *Thornburg* Court explained that a court should use the following standards in assessing these two voting practices: "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim ... and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legal-ly significant white bloc voting." *Id.* at 56–57, 106 S.Ct. at 2769–70 (citation omitted). The Court added that, in determining whether white bloc voting can minimize or cancel the ability of black voters to elect representatives of their choice, a court should consider a number of factors, including "the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field." *Id.* at 56, 106 S.Ct. at 2770. The Court, however, cautioned that the number of elections that must be studied in order to determine whether voting is racially polarized will vary according to the number of elections in which the minority group has sponsored candidates. *Id.* at 57 n. 25, 106 S.Ct. at 2770 n. 25. "Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the election process. Similarly, where a minority group has begun to sponsor candidates just recently the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Id.*

The plaintiffs here have met these standards through the testimony of lay witnesses and through statistical evidence presented by their expert witness, Dr. Gordon Henderson.[5] In applying the above standards and in considering the above factors to show the difference in black and white voting patterns, Dr. Henderson used the same statistical technique—bivariate regression analysis—used by the expert in *Thornburg* and approved by the *Thornburg* Court.[6] *Id.* at 60–73, 106 S.Ct. at

---

**4.** Of course, the two preconditions—racially polarized voting and ability to construct a majority black single-member district—are specially tailored to the "results" challenge presented in *Thornburg* and thus may not necessarily apply to other types of § 2 challenges, based on either the intent or results tests. *See Thornburg,* at 45–47 n. 12, 106 S.Ct. at 2764–65 n. 12.

**5.** The school board did not present an expert.

**6.** Because Dr. Henderson needed to know the racial composition of the voters for each precinct and because Baldwin County did not maintain such a list, Dr. Henderson had to rely on a survey conducted by plaintiffs to identify the race of the voters on the registration list.

2772–79 (Brennan, J., plurality opinion, in which Marshall, Blackmun, and Stevens, JJ., joined) (bivariate regression analysis is preferrable to multivariate regression analysis); *id.* at 83–106, 106 S.Ct. at 2784–95 (O'Connor, J., concurring opinion, in which Burger, Powell, and Rehnquist, JJ., joined) (use of bivariate regression analysis in pending case not clearly erroneous); *id.* at 82, 106 S.Ct. at 2783 (White, J. concurring) (same). *See also City of Carrollton Branch of the National Association for the Advancement of Colored People v. Stallings,* 829 F.2d 1547, 1558 (11th Cir. 1987) (approving the use of bivarate regression analysis).

Plaintiffs' evidence establishes in two ways that black people in Baldwin County constitute a politically cohesive unit. First, Dr. Henderson analyzed precinct election returns for the two county-wide elections in which a black person had run for local office in Baldwin County. These elections were Ruth Smith Williams's race for a board seat in 1976, and Fred E. Stevenson's race of a board seat in 1982. Dr. Henderson's analysis revealed that black voters' support for the two black candidates was overwhelming. In 1976, 92% of the black voters voted for Williams, and in 1982, 65% of the black voters voted for Stevenson. Second, the plaintiffs' lay testimony revealed that there is a strong sense of community among black neighborhoods in Baldwin County, and that blacks throughout the county are generally unified behind and strongly support one political organization, the local chapter of the Alabama Democratic Conference, a black state political organization.

Dr. Henderson's testimony also revealed white bloc voting that effectively canceled out the ability of Baldwin County black voters to elect representatives of their choice. In sharp contrast to his findings of strong black support for black candidates,

he found that most white voters did not vote for black candidates. No black person has ever been elected to the county school board, and in those instances where blacks did run, they were defeated due to lack of white support; although 92% of the black voters supported Williams in 1976, only 13% of the white voters did, and although 65% of the black voters supported Stevenson, only 29% of the white voters did.[7]

The court recognizes, however, that Dr. Henderson's analysis was limited to two elections. However, as observed earlier, the fact that statistics are available from only one or two elections does not foreclose a finding of vote dilution, especially where other § 2 factors point in that direction. Here, as will be demonstrated below, these other factors clearly show that, due to at-large voting, black citizens of Baldwin County are being denied equal access to the political process.

2.

Second, the plaintiffs have met the *Thornburg* precondition that they be sufficiently large and geographically compact to constitute a majority in a single-member district. They have submitted a districting plan with seven single-member districts, one of which, district one, has a black voting-age majority.[8]

The Baldwin County Board of Education argues that the plaintiffs' plan is unacceptable because it is too elongated and curvaceous and thus fails to meet the requirement of "compactness." By compactness, *Thornburg* does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm, by itself, would be not only unrelated to the legal and social issues presented under § 2, it would be an unworkable concept, resulting in arbitrary

---

While the evidence reflected that this survey probably contained some errors, it was undisputed that the effect of any errors was to underestimate the degree of racially polarized voting in the county.

**7.** These percentages are similar to the percentages found adequate in *Thornburg,* 478 U.S. at 79–83, 106 S.Ct. at 2782–83.

Moreover, the evidence showed that Stevenson acquired a higher percentage of the white vote than Williams did because Stevenson conducted a very low profile campaign and many of the white voters were unaware of his race.

**8.** A copy of plaintiffs' plan is attached as Appendix A.

and capricious results, because it offers no guidance as to when it is met. It is apparent from the *Thornburg* opinion that compactness is a relative term tied to certain practical objectives under § 2; the requirement is not that a district be compact, but that it be "sufficiently" compact under § 2. The term is a "practical" or "functional" concept, which must be considered in relation to § 2's laudatory national mission of opening up the political process to those minorities that have been historically denied such. As the Court wrote, " 'the question whether the political processes are "equally open" depends upon a searching and practical evaluation of the "past and present reality" ' ... and on a 'functional' view of the political process." *Id.* at 45, 106 S.Ct. at 2764 (citations omitted). The degree of geographical symmetry or attractiveness is therefore a desirable consideration for districting, but only to the extent it aids or facilitates the political process, and only as one among many considerations a court should include, the principal one being § 2's vote dilution prohibition, in determining whether there is sufficient compactness for a majority black district. *See Skolnick v. State Electoral Board of Illinois,* 336 F.Supp. 839, 843 (N.D.Ill.1971); *see also Connor v. Finch* 431 U.S. 407, 425, 97 S.Ct. 1828, 1839, 52 L.Ed.2d 465 (1977); *Gaffney v. Cummings,* 412 U.S. 735, 752 n. 18, 93 S.Ct. 2321, 2331 n. 18, 37 L.Ed.2d 298 (1973).

The court therefore believes, especially in light of § 2's strong national mandate, that a district is sufficiently geographically compact if it allows for effective representation. For example, a district would not be sufficiently compact if it was so spread out that there was no sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other; or if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived within the district. Also of importance, of course, is the compactness of neighboring districts; obviously, if, because of the configuration of a district, its neighboring districts so lacked compact-

ness that they could not be effectively represented, the *Thornburg* standard of compactness would not be met. These are not, however, the only factors a court should consider in assessing a proposed district; because compactness is a functional concept, the number and kinds of factors a court should consider may vary with each case, depending on the local geographical, political, and socio-economic characteristics of the jurisdiction being sued.

■ The seven-member redistricting plan proposed by the plaintiffs meets this functional standard. In response to direct questions from the court, the superintendent of the Baldwin County Board of Education testified that he saw no administrative or other problems with the configuration of the proposed majority-black district in the plaintiffs' plan, and that the district could be effectively represented; in his words, the district is "manageable." The evidence also reflected that there would be a strong sense of community within the proposed black district. Moreover, and perhaps most telling, the five-member plan the school board proposed in settlement of this lawsuit has a single-member district—district five, which the board contends is majority black—that is just as elongated and curvaceous as the majority black district in the plaintiffs' plan; at the time they submitted their plan, the school board and its superintendent did not consider it to be unacceptable.[9] The Baldwin County Board of Education's contention that the majority-black district in plaintiffs' plan lacks sufficient compactness is disingenuous.

### 3.

In further support of their claim that blacks in Baldwin County are being denied equal access to the political process, plaintiffs have also established the following five § 2 factors:

*First,* this court demonstrated in *Crenshaw County* that from the late 1880's to the present the State of Alabama and its political subdivisions have "openly and unabashedly" discriminated against their black citizens by employing at different times

9. A copy of the Baldwin County Board of Edu-    cation's plan is attached as Appendix B.

such devices as the poll tax, racial gerrymandering, and at-large elections, and by enacting such laws as the anti-single-shot voting laws, numbered places laws, and the Sayre law. 640 F.Supp. at 1356–59. Without question, the present depressed levels of black voter participation in Baldwin County may be traced to these historical devices and laws.

*Second,* in *Crenshaw County,* this court found historic discrimination in all areas of the economic and social life of Alabama blacks, including in education, employment, and health services. 640 F.Supp. at 1359–60. The evidence now before the court reflects that this discrimination has resulted in a lower socio-economic status for Alabama blacks as a group than for whites, and that this lower status has not only given rise to special group interests for blacks, it has depressed levels of black voter participation and has thereby hindered the ability of blacks to participate effectively in the political process and to elect representatives of their choice to the Baldwin County Board of Education.

*Third,* Baldwin County has a majority-vote requirement for primary elections for its county school board. There is also a numbered post requirement for the board. The evidence reflects that these two requirements in conjunction with the at-large election requirement have served as a substantial—indeed, the court is convinced insurmountable—political barrier to the ability of the county's black voting minority to elect candidates to the school board.

*Fourth,* the Baldwin County Board of Education has been particularly unresponsive to the black citizens' concern about race relations in the county's schools, in particular concerns arising out of school desegregation and the apparent resulting displacement of black administrators.

*Fifth and finally,* the Baldwin County Board of Education has not articulated, or offered evidence of, any policy underlying its past and intended continued use of at-large elections.

**4.**

■ The court is convinced by the above evidence that the Baldwin County Board of Education's at-large election system, in-

cluding in particular its majority-vote and numbered-post features, has interacted with the extensive racial polarization in the county to render the ability of the black voters to elect their representative substantially inferior to that of whites. Indeed, the court is convinced that the black citizens of Baldwin County have been effectively left unrepresented because the school board representatives in the county may for the most part ignore the interests of blacks in the county without fear of political consequences. The court is also convinced that this dilution of the black vote—or more appropriately annihilation of it—is not only exacerbated by the depressed social and economic conditions for most blacks in the county, it is perpetuating these conditions. Moreover, and perhaps most sadly, because these depressed conditions are due to this state's long and immoral history of treating its own black citizens as second class, this dilution of the black vote is also effectively perpetuating this discrimination, such that each black child born in Baldwin County is automatically a new victim to this history.

## IV. DISCRIMINATORY INTENT

As stated, the plaintiffs also rest their § 2 complaint on discriminatory intent. There are at least two methods of establishing a § 2 intent claim. The plaintiffs have shown by both methods that the system used to elect the Baldwin County Board of Education is a product of intentional discrimination.

**A.**

■ A plaintiff may establish a prima facie case of discriminatory intent under § 2 by showing, first, that racial discrimination was a "substantial" or "motivating" factor behind the enactment or maintenance of the electoral system and, second, that the system continues today to have some adverse racial impact. *Hunter v. Underwood,* 471 U.S. 222, 228, 233, 105 S.Ct. 1916, 1920, 1923, 85 L.Ed.2d 222 (1985); *Crenshaw County,* 640 F.Supp. at 1354. This impact may be met by *any evidence* that the challenged system is hav-

ing significant adverse impact on black persons today.[10]  *Id.* at 1354 n. 5. If the plaintiff establishes these two elements, the burden then shifts to the scheme's defender to demonstrate that the scheme would have been enacted without the purposefully discriminatory factor. *Hunter,* 471 U.S. at 228, 105 S.Ct. at 1920; *Crenshaw County,* 640 F.Supp. at 1355.

■  The plaintiffs have relied on this court's earlier findings in *Crenshaw County,* unchallenged here, that the Alabama legislature adopted numbered place laws in 1961 in order to make local at-large elections systems "more secure mechanisms for discriminations" against the state's black citizens.  640 F.Supp. at 1357.  In other words, the state adopted numbered place laws and continued to maintain at-large systems across the state for the specific purpose of racial discrimination.  The evidence is undisputed that the Baldwin County Board of Education's at-large system, including the numbered-place feature, is a product of these racially discriminatory efforts of the Alabama legislature.  Moreover, as demonstrated in Part III of this opinion, the evidence is overwhelming that the enactments continue today to have their intended racist effect.  The plaintiffs have therefore established a prima facie case of intentional racial discrimination.

The Baldwin County Board of Education has, however, offered no evidence whatsoever to rebut the prima facie case, that is, to demonstrate that its at-large system, with its discriminatory feature, would have been maintained as it exists today, or even at all, in the absence the state legislature's discriminatory efforts.  The plaintiffs have therefore clearly established that the school board's at-large election system is a product of racial discrimination.

### B.

■  The second method of establishing intentional discrimination is based primarily on the evidentiary concept of "pattern and practice."  A plaintiff may establish a prima facie case of intentional discrimination by showing, first, that those responsible for the enactment or maintenance of the challenged electoral scheme have engaged in a pattern and practice of enacting and maintaining other, similar schemes for racially discriminatory reasons; and, second, that the challenged scheme has some present day adverse racial impact.  The plaintiff need not show that race discrimination was the sole reason for these other schemes; rather, the plaintiff need show only that race discrimination was a substantial or motivating factor behind these schemes.  If the plaintiff establishes both these elements, the burden then shifts to the defender of the challenged scheme to show either that the scheme was not a product of race discrimination or that, if it was, it would have been enacted or maintained even in the absence of the discriminatory purpose.  *See Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973); *Crenshaw County,* 640 F.Supp. at 1360–61.

The plaintiffs here rely again on this court's findings in *Crenshaw County.*  These finding are that the Alabama legislature has engaged in a century-long pattern and practice of switching between local at-large and single-member district systems as needed to minimize black voting strength.  They have also shown that the at-large system used by the Baldwin County Board of Education was adopted during this period, and, as demonstrated in Part III of this opinion, that the system is adversely affecting blacks in the county today.  The plaintiffs have therefore estab-

---

**10.**  As this court explained in *Crenshaw County,* The discriminatory results needed to establish a section 2 violation in the absence of intentional discrimination should not be confused with the present day adverse racial impact needed to establish a section 2 intent claim. The former is more a term of art, established according to certain Congressionally approved criteria described in footnote 4, *supra;*

whereas, the latter is less stringent and may be met by any evidence that the challenged action is having significant adverse impact on black persons today. *See* Note, *The Constitutional Significance of the Discriminatory Effects of At-large Elections,* 91 Yale L.J. 974 (1982).
640 F.Supp. at 1354 n. 5.

lished a prima facie case of intentional discrimination by pattern and practice.

The Baldwin County Board of Education has, however, offered no evidence to rebut the prima facie case. It has made no effort to show that its at-large system was not a product of race discrimination or that its system would have been adopted even in the absence of the legislature's discriminatory purpose. The plaintiffs have therefore established, by use of pattern and practice, that the Baldwin County Board of Education's at-large election system is a product of intentional racial discrimination.

## V. RELIEF

■ The plaintiffs having established that the Baldwin County Board of Education's election scheme violates § 2, the next issue for this court is a remedy. Congress has made clear that a

> court should exercise its traditional equitable powers to fashion the relief so that it *completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

1982 U.S.Code Cong. at 208 (emphasis added). Thus, in the appeal of *Crenshaw County,* the Eleventh Circuit instructed that this court could not adopt any remedy that itself violates § 2, 831 F.2d at 249, or that does not itself "completely" and "with certitude" remedy the § 2 violation. *Id.* at 252. However, in exercising this broad equitable authority, a court must, whenever practicable, afford the jurisdiction an opportunity to remedy the violation first, *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978), with deference accorded the jurisdiction's plan if it provides a full, legally acceptable remedy. *Tallahassee Branch of NAACP v. Leon County,* 827 F.2d 1436, 1438–40 (11th Cir.1987). But if the jurisdiction fails to remedy completely the violation or if its proposed remedial plan itself constitutes a § 2 violation, the court must itself take measures to remedy the violation, but any court remedy must be narrowly tailored to include only those measures necessary to cure the defect. *Upham v. Seamon,* 456

U.S. 37, 42–43, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982) (per curiam).

■ As stated, to cure the § 2 violation, the Baldwin County Board of Education has submitted a single-member district plan with five districts; the school board contends that one of these districts, district five, has a majority black population of 9,024 or 59.65%, based on 1980 census data. The evidence reflects, however, that the school board's plan not only fails to cure the § 2 violation, it violates § 2 itself. The school board's plan simply fails to take into account evidence that by 1990 Baldwin County is expected to have experienced a boom in population, from 78,556 in 1980 to 98,820, with most of the increase being white. With this boom each of the five districts under the board's plan will have to have approximately 19,764 people to meet one-person one-vote constitutional requirements. *See generally Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Even if 738, or 75%, of the expected 984 increase in black population move into district five, the district would have a black population of only 9,762 or 49.39%. And even if the very unlikely happened, and *all* of the expected 984 blacks moved into district five, the district would have a black population of only 10,008 or 50.64%, which, when considered with the fact that a much larger percentage of blacks than whites in the county are under 18 and thus not of voting age, would not translate into a majority-black voting-age district. The school board's plan does not provide a district in which, in the face of the severe adverse political, socio-economic and historical conditions in the county, blacks would have a reasonable opportunity to elect a representative of their choice.

The plan proposed by the school board therefore not only fails far short of providing an election plan under which black citizens of the county would have an equal opportunity to participate in the political process, it would also continue their submersion in a majority-white population, which, because of racially polarized voting and other socio-economic and historical conditions in the county, would still be able regularly to defeat the choices of black

voters and to ignore their interest without fear of political consequences. As stated, the board's plan would itself violate § 2.

■ In strong contrast to the board's plan, the plan proposed by the plaintiffs, which has seven single-member districts, provides full relief. It provides for a district, district one, with an expected 1990 black population of over 63% of the total district population. The evidence reflects that, when all the political, socio-economic and historical characteristics are considered, this district will also have a clear black voting-age population, capable of electing a representative of their own choice. Moreover, as is apparent from the above discussion, the selection of a plan with seven, rather than five, single-member districts reflects a conservative remedy limited to only those measures necessary to cure the violation.[11]

## VI. THE SETTLEMENT

Finally, the school board claims that it is entitled to enforcement of its settlement with plaintiffs' counsel. To be sure, voluntary settlement is the preferred means of resolving class action cases. *See Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir.1978) (employment discrimination case), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). It is equally clear, however, that the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is fair, adequate, and reasonable, *id.;* the court also has a duty to ensure that the settlement is not illegal or against public policy. *Harris v. Graddick*, 615 F.Supp. 239, 242 (M.D.Ala.1985). Moreover, where, as in this case, there is a fundamental right, the right to vote, at issue, and where the class on whose behalf the court is assaying the settlement is politically, economically, and socially depressed and has no

avenue of redress for violation of this fundamental right except through the court, the court has heightened responsibility to be sure that the settlement measures up.

With these principles in mind, the court finds that the settlement, which embodies the school board's proposed single-member district plan of five members, is neither fair, adequate, reasonable, nor legal. As demonstrated above, it not only fails to cure the § 2 violation claimed by the plaintiffs, it is itself a violation of § 2. For this court to adopt and implement the school board's plan, it would condemn the black citizens of Baldwin County to continued second class citizenship, but this time with the imprimatur of a federal court.[12]

## VII. CONCLUSION

In conclusion, the court finds that the Baldwin County Board of Education's current at-large election system violates § 2, under both the intent and results tests. The court further finds that the remedy proposed by the school board and initially offered in settlement, which has five single-member districts, fails to cure the § 2 violation and itself violates § 2. The court further finds, however, that the plaintiffs' plan, which has seven single-member districts, fully remedies the § 2 violation, does not itself violate § 2, and meets all one-person one-vote requirements. The court will therefore require that the school board implement the plaintiffs' plan in time for the upcoming 1988 elections.

An appropriate judgment and injunction will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of the plaintiffs and

---

**11.** The court also notes that the Baldwin County Board of Education has not contested that plaintiffs' seven-member plan satisfies the one person one-vote requirement.

**12.** Furthermore, the evidence showed that the lawyers for the plaintiff class agreed to the settlement *due to a miscommunication with*

members of the plaintiff class, and that no members of the plaintiff class ever agreed to the settlement. Thus, in addition to the reasons given above, the court refuses to enforce the settlement because to do so would unfairly deny all black citizens in Baldwin County of their right to vote because of a mistake for which they were not at fault.

against defendant Baldwin County Board of Education;

(2) That it be and is hereby DECLARED that the at-large system used to elect the members of defendant Baldwin County Board of Education violates § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973;

(3) That it be and is hereby DECLARED that the single-member redistricting plan, consisting of five members, submitted by defendant Baldwin County Board of Education is unacceptable under § 2 of the Voting Rights Act;

(4) That the motion to enforce remedy agreement, filed on November 20, 1987, by defendant Baldwin County Board of Education be and it is hereby denied; and

(5) That defendant Baldwin County Board of Education, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and each is hereby RESTRAINED and ENJOINED:

(A) From using its present at-large election system in any future elections;

(B) From failing to implement the single-member redistricting plan, consisting of seven members, submitted by the plaintiffs; and

(C) From failing to conduct elections for all members of the defendant Baldwin County Board of Education under the plaintiffs' redistricting plan by January 1, 1989.

It is further ORDERED that by April 22, 1988, the parties are to submit to the court proposed procedures for implementing the plaintiffs' redistricting plan, as ordered.

It is further ORDERED that the plaintiffs have and recover from defendant Baldwin County Board of Education their reasonable attorney fees, and that the plaintiffs be and they are hereby allowed until the completion of all the *Dillard* cases to file their request for attorney fees.

It is further ORDERED that costs be and they are hereby taxed against defendant Baldwin County Board of Education, for which execution may issue, and that plaintiffs be and they are hereby allowed until the completion of all the *Dillard* cases to file their bill of costs.

The clerk of the court is DIRECTED to issue a writ of injunction.

APPENDIX A

PLAINTIFFS'
PLAN

APPENDIX B
THE SCHOOL BOARD'S
PLAN