Mattie S. McDANIELS, et al.,
Plaintiffs,

v.

Anthony P. MEHFOUD, et
al., Defendants.

Civ. A. No. 88–0020–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 30, 1988.

Richard Taylor, Hill, Tucker & Marsh,
Gerald T. Zerkin, Karen L. Ely–Pierce, Ger-
ald T. Zerkin & Associates, Richmond, Va.,
for the American Civil Liberties Union of
Virginia Foundation.

Susan L. Quig–Terry, American Civil Liberties Union, of Virginia Foundation, Richmond, Va., for plaintiffs.

R. Harvey Chappell, Jr., Paul W. Jacobs, II, Christian, Barton, Epps, Brent & Chappell, Joseph P. Rapisarda, Jr., W. Todd Benson, Joseph T. Tokarz, Office of the Co. Atty., County of Henrico, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on plaintiffs' complaint challenging the current method of electing the Board of supervisors in Henrico County, Virginia. Plaintiffs allege that the county districting plan, put into effect in 1981, impermissibly denies or abridges plaintiffs' rights to vote on account of race in violation of § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and was adopted and is being maintained purposefully to dilute black voting strength in violation of the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Plaintiffs seek injunctive and declaratory relief and have submitted two proposed redistricting plans for the Court's consideration. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 2201, 2202 and 42 U.S.C. § 1973j(f).

For the reasons set forth below, the Court finds from the evidence at trial that the county's electoral districting scheme violates § 2 of the Voting Rights Act. Because the Court finds the current plan invalid under § 2, it is unnecessary to reach the constitutional issues. The Court will grant the defendants seventy five (75) days to submit an acceptable remedial plan.

I. *Background*

The individual plaintiffs in this case, Mattie S. McDaniels, Frank J. Thornton, Sr., Carl McMillian, Sam Creighton, Charles E. Scott, Francis J. Justis, Reverend Reginald Stevens, Helen E. Harris, C.W. Archer, Sanada Lindsey, Sadie C. Sears, David Goodall, Sr., Elliot M. Harris, Robert Melvin, Jr., John E. McNeil, Sr., Alonzo Anderson, Walter Bullock, Leamon Clayton, Jr., are adult black residents of Henrico County, Virginia. All of the individual plaintiffs are citizens and registered voters of the Commonwealth of Virginia. The organizational plaintiffs, the Henrico County Civic League, the Montezuma Oak–Hill Civic Association and the Henrico Political Task Force, are nonprofit organizations founded by residents of Henrico County. The defendants in this action are the members of the Board of Supervisors of Henrico County, the members of the Electoral Board of Henrico County and the Registrar of voters for Henrico County. All of the defendants are white.

Henrico County is an urban and suburban county surrounding Richmond, Virginia on the west, north and east. According to the 1980 Census, the total population of Henrico County is 180,735, of which 27,096, or 15.0% are black. Census data for 1960 revealed that 5.1% of the county population was black at that time, and in 1970 the Census showed that the percentage of blacks in the county had increased to 6.5%.

Since 1938, Henrico County has been governed by a Board of Supervisors whose members are elected from single-member districts. The current Board is comprised of five Supervisors, each elected by a plurality vote for a four-year term. The County's five magisterial districts are: Brookland, Fairfield, Three Chopt, Tuckahoe and Varina.

Following issuance of the 1980 Census data, the Henrico County Planning Office determined that the population of the five districts was malapportioned. In the spring of 1981, County Planner Cheryl P. Evans redrew the district lines in an effort to bring the county back into compliance with the constitutional requirement of one person, one vote. After the 1981 redistricting, the racial composition of the magisterial districts was as follows:

| | Total | Black | Percent | % Total Black |
|---|---|---|---|---|
| Brookland | 35,498 | 4,127 | 11.6 | 15.2 |

| | Total | Black | Percent | % Total Black |
|---|---|---|---|---|
| Fairfield | 36,709 | 15,724 | 42.8 | 58.0 |
| Three Chopt | 36,190 | 1,502 | 4.2 | 5.5 |
| Tuckahoe | 36,606 | 1,106 | 3.0 | 4.1 |
| Varina | 35,732 | 4,637 | 13.0 | 17.1 |
| TOTAL | 180,735 | 27,096 | | |

Prior to the 1981 redistricting, 39.6% of all citizens of Fairfield Magisterial District were black, and 50.8% of all black persons living in Henrico County lived in Fairfield District.

No black has ever been elected to the Henrico Board of Supervisors. Prior to 1979 no black had ever run for the position, and since that date there have been three black candidates: Herb Johnson ran for Supervisor in the Varina District in 1979; Larry Jones ran in Fairfield in 1983; and Frank Thornton ran in Fairfield in 1987. All three were defeated. In addition, as of the date of the trial in this case, no black had ever been appointed to the Henrico County School Board.

## II. *Discussion*

■ In 1982, Congress amended § 2 of the Voting Rights Act to "make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of practice in order to establish a violation." S.Rep. No. 417, 97th Cong., 2d Sess. 27 (1982), U.S.Code Cong. & Admin.News 1982, pp. 177, 204. Instead, plaintiffs need only show that the practice in question "in the context of all the circumstances" denies minorities equal access to the political process. *Id.* As amended, § 2 of the Voting Rights Act reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class or citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

In the Senate Report accompanying the 1982 amendment to § 2, the Judiciary Committee stated that the "question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality.'" S.Rep. No. 417, 97th Cong., 2d Sess. 30, U.S.Code Cong. & Admin.News 1982, p. 208 (quoting *White v. Regester,* 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973)). To aid courts in performing this evaluation, the Committee proposed a fact-intensive test for § 2 violations, which includes the consideration of nine enumerated factors:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417 at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 205–207 (footnotes omitted).

The Senate Report went on to add that this list of factors is not exhaustive and "that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 29, U.S.Code Cong. & Admin.News 1982, p. 207.

The United States Supreme Court had the opportunity to construe § 2 of the Voting Rights Act for the first time following the 1982 amendment in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Gingles* the Court reiterated that the "essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2765. While *Gingles* acknowledged the relevance of the Senate factors, the Court found that there are three "necessary preconditions" to the finding of a § 2 violation: it must be shown that the minority group is

First, "sufficiently large and geographically compact to constitute a majority in a single-member district"; second, the minority group must be able to show that it is "politically cohesive"; and third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. at 2766–67.[1]

The Court now turns to an analysis of each of the three *Gingles* prerequisite factors and the applicable Senate factors to determine whether under the "totality of the circumstances," a violation of the Voting Rights Act has been successfully proven.

### *The Gingles Test*

■ First, the Court finds that the plaintiffs have successfully shown that the black population in Henrico is "sufficiently large and geographically compact" to constitute a majority in one or more single-member districts. As previously stated, there are 27,096 black residents of Henrico County. Of that number, 24,218 are of voting age. Further, while blacks make up 15% of the county population, they are not, as defendants contend, dispersed through-

**1.** The United States Court of Appeals for the Fourth Circuit has referred to the *Gingles* preconditions as "threshold proof requirements." *McGhee, et al. v. Granville County, et al.,* 860

F.2d 110, 115 (4th Cir.1988). *See also Collins v. City of Norfolk, Va.,* 816 F.2d 932, 935 (4th Cir.1987).

out the county. Fifty-eight percent of the black population of the entire county reside in one magisterial district: Fairfield. *See* Table *supra.* The Tuckahoe and Three Chopt Districts contain a black population of only 3% and 4.2% respectively. Although the population of Varina District is 13% black, 67.7% of the blacks in the district reside in 3 of the 9 voting precincts: Highland Springs, Sullivans and Town Hall. Similarly, while the Brookland District is home to 11.6% of the black population of the county, 71.8% of the blacks in Brookland live in only 3 of the 11 precincts that make up that district: Longdale, Wistar and Glen Allen. In sum, the majority of the blacks in Henrico County live in one magisterial district, and to the extent that blacks reside in other districts, they are concentrated in a few specific areas. (Pl. Exh. 22).

Plaintiffs have submitted to the Court two proposed redistricting plans, each of which illustrates that it is possible to meet the requirement of *Gingles* and create a single-member district with a black majority. Using 1980 census data, the plaintiffs have constructed a five-member plan under which Fairfield District would contain a black majority of 55.4% of the population, or 51% of the voting age population. Alternatively, plaintiffs have submitted a proposed seven-member plan which would contain a black majority district of 61.5% of the population, or approximately 57% of the voting age population. (Pl. Exhs. 56, 58).

■ Defendants argue the neither plan is sufficient to give plaintiffs an "effective voting majority," and thus that plaintiffs have failed to meet the first requirement in *Gingles.* Defendants' experts, Dr. Richard Niemi and Dr. Thomas Guterbock, made several predictions, based on estimated voter registration and turnout rates, as to the percentage of blacks necessary in a district to equalize the black and white voter turnout, that is, to have blacks represent 50% of those adults turning out to vote. Their estimates ranged from 59.1% of the total population (Def. Exh. 89A), to 61% (Testimony of Guterbock), to 66.6% (Def. Exh. 89B). The Court finds, however, that defendants' analysis is misguided. Plaintiffs need not demonstrate that blacks could comprise a majority of those actually turning out to vote, but rather, must show that blacks would comprise a majority of the voting age population. *See, e.g., McNeil v. Springfield Park Dist.,* 851 F.2d 937, 944–45 (7th Cir.1988) (first requirement in *Gingles* is measured by voting age population).

■ *Gingles* requires plaintiffs, as a threshold matter, to demonstrate that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district because "[u]nless the minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17 (emphasis in the original). Plaintiffs, however, need not demonstrate that the minority will have a "safe seat" in the proposed district, or even that they will constitute a majority of voters turning out on election day. What plaintiffs must show is that absent the challenged structure, the minority has a reasonable opportunity to elect a representative of their choice. Plaintiffs have demonstrated that it is possible to create a district with a majority black general and voting age population. Further, plaintiffs' expert, Dr. Allan J. Lichtman, demonstrated to the Court's satisfaction that given a black majority district of 55% or more, plaintiffs have a reasonable opportunity to elect their candidate of choice.[2] Indeed, the United States Court of Appeals for the Fourth Circuit, in holding that a county's proposed remedial single member district plan containing seven districts, one of which had a 51.8% black voting age population and described by its opponents as providing no better than a "fighting chance" to elect a representative of their choice, met the rele-

---

2. Dr. Lichtman testified that given the black and white voting age populations and rates of voter turnout and the degree of racial block voting, a 55.4% majority black district could elect their candidate of choice by a projected vote of from 50.5% to 56.5%.

vant standards to effect a complete remedy for a specific violation of Section 2 voting rights. *See McGhee, et al. v. Granville County, et al.,* 860 F.2d 110 (4th Cir.1988).

The second and third parts of the *Gingles* test focus on the issue of racially polarized voting. Through an examination of racially polarized voting, the Court may ascertain whether minority group members constitute a politically cohesive unit, the second element in the *Gingles* test, and whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate, the final *Gingles* condition. *See Gingles,* 478 U.S. at 56, 106 S.Ct. at 2770.

As stated by the United States Court of Appeals for the Fourth Circuit, the legal standard for determining racial polarization in voting "looks only to the difference between how majority votes and minority votes were cast.... The Court should inquire separately into minority and majority voting, to see whether members of the minority usually vote for the same candidates—if so, there is the requisite minority political cohesiveness—and to see whether the majority vote is sufficiently homogenous to cancel the minority vote plus the crossover vote." *Collins v. City of Norfolk, Va.,* 816 F.2d 932, 935–36 (4th Cir. 1987). In the instant case, the Court is satisfied that voting patterns in Henrico County reveal a "severe and persistent pattern of racially polarized voting." (Testimony of A. Lichtman).

Racially polarized voting can be established through both anecdotal evidence and electoral analysis. *See Carrollton Branch NAACP v. Stallings,* 829 F.2d 1547, 1558–59 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *League of United Latin American Citizens v. Midland Independent School District,* 648 F.Supp. 596, 601–02 (W.D.Tex.1986), *aff'd* 829 F.2d 546 (5th Cir. 1987). Through lay and expert testimony, plaintiffs demonstrated the following: in the 1983 supervisory election in Fairfield

District, the black candidate, Larry D. Jones, ran against the white incumbent, John A. Waldrop, Jr., and received 42.0% of the vote; in the 1987 supervisory election in Fairfield, the black candidate, Frank J. Thornton, ran against Mr. Waldrop and received 41.9% of the vote. Fairfield District has a black population of 42.8%.

Dr. Lichtman performed an ecological regression analysis on these two elections along with two others in Fairfield District in which a black candidate had run against a white opponent: the 1985 lieutenant governor's race, and the 1985 Virginia House of Delegates election.[3] In his analysis, Dr. Lichtman compared the vote in each precinct with the racial composition of the precinct to form an estimation equation. This methodology was similarly used by Dr. Bernard Grofman, the plaintiff's expert witness in the *Gingles* case, and has been cited with approval by other federal courts. *See, e.g., Stallings,* 829 F.2d at 1558; *Dillard v. Baldwin County Board of Education,* 686 F.Supp. 1459, 1464–65 (M.D. Ala.1988). According to Dr. Lichtman's estimations, more than 99% of the blacks in Fairfield District voted for the black candidate in the 1983 supervisory election, the 1985 lieutenant governor's race and the 1987 supervisory election. In addition, Lichtman estimated that despite the fact that most blacks in the county are members of the Democratic Party, when a black candidate ran as a Republican in the Virginia House of Delegates, he received 63% of the black vote. As Lichtman described it, black candidates in Fairfield receive the support of black voters "at over landslide levels." White voters, however, showed similarly solid support for white candidates. According to the ecological regression estimates, 84% of white voters voted for the white candidate in the 1983 supervisory election, 80% in the 1987 supervisory race, 64% in the 1985 lieutenant governor's election and 67% in the 1985 delegates election.

---

**3.** Ecological regression analysis was described as a methodology utilizing information applicable to an ecological unit—in this case, a political unit, individual precincts, in which voters are grouped. Its purpose, in cases such as the instant one, is to estimate the voting behavior of the whites and blacks grouped into the individual precincts.

Further, defendants' own expert, Dr. Niemi, testified that the rate of white crossover voting in Fairfield supervisory elections is lower than estimated by Dr. Lichtman. According to Niemi, closer to 88% of the white voters vote for the white candidate, while 92—93% of black voters vote for the black candidate. In fact, on cross examination, Niemi agreed that there is "a lot of racial polarization" in the supervisory elections.

As further evidence of cohesiveness among the black minority population in Henrico, plaintiffs offered the testimony of several black community leaders. Mr. Chris W. Archer, co-founder of the Henrico County Civic League, an organization founded to address the concerns of the black community, testified that blacks in Henrico are brought together on many issues of importance to them such as the lack of black representation on the school board[4] and other county boards and commissions and the failure of Henrico County schools to observe Martin Luther King's birthday as a pupil holiday. Similar testimony was elicited from David Goodall, Sr., Mattie McDaniels, and Helen Harris. The civic league has been engaged in ongoing and often successful drives to register black voters in Henrico. Strong black cohesion was also largely responsible for the candidacies of Thornton and Jones.

In sum, the Court finds that there is a strong indication of minority political cohesiveness and bloc voting by the majority sufficient to cancel the minority plus the cross-over vote in Henrico County. Thus, the three preconditions specified in *Gingles* have been established.

*Other Senate Factors*

1. *History of Discrimination*—As stipulated by the parties, "[t]here is a history of official discrimination in the Commonwealth of Virginia and in Henrico County," (Stip. 18) that has adversely affected the rights of blacks to vote. Plaintiffs have submitted, in their Second Request for Ju-

dicial Notice and attached exhibits, a list of past racial laws of the state of Virginia. The Court here notes a few relevant examples: the state constitutional requirement, in effect until 1974, that all persons registering to vote present proof of literacy, *see Commonwealth of Virginia v. United States*, 386 F.Supp. 1319 (D.D.C.1974), *aff'd* 420 U.S. 901, 95 S.Ct. 820, 42 L.Ed.2d 833 (1975); the maintenance, until 1966, of a poll tax that discriminated against black voters, *see Harper v. Virginia State Board*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); the requirement, in effect until 1963, that names on voter registration and poll tax lists be separated by race, *see Griffin v. Board of Supervisors of Prince Edward County*, 339 F.2d 486 (4th Cir. 1964); *Hamm v. Virginia State Board*, 230 F.Supp. 156 (E.D.Va.), *aff'd sub nom. Tancil v. Woolls*, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964); and the requirement, until 1963, that the races be segregated in places of public assemblage, *see Brown v. City of Richmond*, 204 Va. 471, 132 S.E.2d 495 (1963); *Blackwell v. Harrison*, 221 F.Supp. 651 (E.D.Va.1963).

The effects of this sad history can be seen in Henrico County today in the form of lower registration and turnout rates for black voters. (Pl. Exhs. 26—28; Def. Exh. 89).

2. *Voting Practices and Procedures*— As stipulated by the parties, "Henrico County has no majority vote requirements, run-off requirements, anti-single shot requirements or full-slate requirements." (Stip. 6).

3. *Discrimination in Education, Employment and Health* By stipulation of the parties, it was agreed that "[s]ince 1980, black citizens of Fairfield District have had substantially the same levels of education, income and employment as white citizens in Fairfield District," and that "[c]ounty-wide levels of education, income and employ-

---

4. School Board members are appointed by and serve at the pleasure of the Supervisors. The civic league, along with the Henrico Chapter of the NAACP and the Henrico Ministers Fellow-

ship worked to select six candidates for nomination to the Henrico School Board in 1988. Despite their efforts, no black was appointed.

ment for black persons are higher than for black persons elsewhere in the State." (Stip. 17). Despite the substantial similarities, however, some differences remain. Of persons 25 years and older in Henrico, 63.6% of the blacks are high school graduates versus 70% of the whites. For employed persons 16 years and over, 2,504 blacks (18%) in Henrico County hold managerial and professional specialty occupations, versus 21,004 (27%) whites. Only one of the 109 highest paid employees of the county is black and only 17 of the top 509 positions are held by blacks. The median income for black families in the county is $19,824 versus $23,202 for white families. In Henrico County, 11.2% of the black population and 5.2% of the white population lives below the poverty line. (Pl. Exhs. 38, 39; stip. 17; pl. Third Request for Judicial Notice).

The Court finds that these differences adversely affect the ability of black citizens to participate in and influence the political process in Henrico County. For example, while black candidate Thornton received slightly over $20,000 in contributions to his 1987 supervisory campaign, his white opponent, Waldrop, received slightly over $40,-000. (Pl. Exhs. 5, 6). Further, it was the testimony of the plaintiffs' expert, which the Court accepts as accurate, that participation in the political process is positively correlated with socioeconomic status—that is, the higher a voter's socioeconomic status, the more likely he or she is to participate in politics.

4. *Racial Appeals*—The Court finds that racial appeals were made in both of Waldrop's successful campaigns against black opponents. In his efforts to secure a seat on the Board of Supervisors in both 1983 and 1987, Waldrop circulated a campaign flyer that included a picture of himself and his black opponent. (Pl. Exhs. 1, 2). Mr. Waldrop testified that the picture was necessary as part of a format designed to compare the accomplishments of each candidate in the election. However, testimony revealed that the flyer had not been received by members of the predominantly black communities in Fairfield, as it had been in the white communities. Nor did Waldrop utilize the same flyer format to compare himself to his white opponent in his campaign for election to the United States House of Representatives.

5. *Minority Election to Public Office*— As heretofore stated, no black has ever been elected to the Henrico Board of Supervisors or, as of the date of the trial in this case, to the Henrico School Board. Dr. William F. Reid, a black citizen, testified that at the time of his election he was the first and only black since Reconstruction to serve as a representative of Richmond and Henrico in the Virginia House of Delegates. Dr. Reid's first election was as one of eight people elected to represent the City of Richmond and Henrico County jointly. He ran as a member of a Democratic team and in Henrico County he received the fewest votes of the successful candidates. He expressed the view that during each of his three terms people voted primarily along racial lines. In 1971, because of reapportionment he was elected as a floater delegate for the City of Richmond and Henrico County. He attributed his successful bids for elective office to the fact that he ran well in the predominantly black precincts in the city. Dr. Reid served from 1967 to 1973 when, in his opinion, he was defeated because of his stand favoring busing to promote school integration. He lost to a white candidate though he resided in Henrico and was an incumbent, while his opponent was a resident of the city. He testified that he ran well in the city and was defeated in the county.

6. *Responsiveness of Elected Officials* —There was much testimony offered on the issue of responsiveness. The Court was most struck, however, by the simple fact that when asked, none of the five sitting members of the Henrico Board of Supervisors could identify a single issue of unique concern to the black community— despite notable publicity of, among other things, black efforts to have a black appointed to the school board. In fact, two of the five Supervisors had no idea what percentage of their constituencies are black. While these facts may not rise to the level of a "significant lack of responsiveness,"

as contemplated in the Senate Report, the Court finds that it does constitute disregard of the "particularized needs of members of the minority group."

In sum, the Court has considered the totality of the circumstances in Henrico County, and has found that racially polarized voting, the legacy of official discrimination in voting matters, and to a lesser extent, the continuing effects of discrimination in education and employment, have combined with the single-member districting scheme to impede the ability of a geographically compact and politically cohesive group of blacks to participate equally in the political process and to elect their candidates of choice in violation of the Voting Rights Act of 1965.

### III. *Remedy*

■ Congress has stated that once a violation of voting rights has been established, the Court "should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 31 (1982), U.S.Code Cong. & Admin.News 1982, p. 208. However, in exercising its equitable powers, the Court should give the appropriate legislative body the first opportunity to provide a plan that remedies the violation. *See McGhee, et al. v. Granville County, et al.*, 860 F.2d 110, 115 (4th Cir.1988); *Tallahassee Branch of NAACP v. Leon County, Fla.*, 827 F.2d 1436, 1438—40 (11th Cir.1987), *cert. denied*, ── U.S. ──, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988); *Dillard*, 686 F.Supp. at 1469. If the affected legislative body fails to respond, or responds with a proposed remedy that itself constitutes a § 2 violation, then the Court must fashion an appropriate plan. *See McGhee*, 860 F.2d at 115.

Accordingly, the Court will grant defendants seventy-five (75) days to submit an acceptable remedial plan.

An appropriate Order shall issue.

### JUDGMENT ORDER

For the reasons stated in the accompanying Memorandum, and deeming it proper so to do, it is ADJUDGED and ORDERED that judgment be, and the same is hereby entered in favor of the plaintiffs.

It is further ORDERED that the defendants submit a proposed remedial plan within seventy five (75) days of the date of this Order.