John DILLARD, et al., Plaintiffs,

v.

**CHILTON COUNTY BOARD OF EDUCATION, Defendant.**

John DILLARD, et al., Plaintiffs,

v.

**CHILTON COUNTY COMMISSION, Defendant.**

Civ. A. Nos. 87–T–1178–N, 87–T–1179–N.

United States District Court, M.D. Alabama, N.D.

June 23, 1988.

James U. Blacksher, Edward Still, Reeves & Still, Birmingham, Ala., Julius L. Chambers, Scherlyn Ifill, NAACP Legal Defense Fund, New York City, for plaintiffs.

Don Siegelman, Alabama Atty. Gen., Susan Russ, Asst. Atty. Gen., Office of Atty. Gen., David Boyd, Balch & Bingham, Montgomery, Ala., John Hollis Jackson, Jr., Clanton, Ala., for defendant.

ORDER

MYRON H. THOMPSON, District Judge.

The plaintiffs have brought these two lawsuits on behalf of all black citizens in Chilton County, Alabama.[1] They charge that the "at-large" system used to elect the Chilton County Commission and Board of Education violates § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.[2] The commission and the school board have admitted that their at-large system violates § 2. The issue before the court is whether a settlement proposed by the parties, incorporating a "cumulative voting" scheme for the county's commission and school board, is acceptable. Several members of the plaintiff class have objected to the settlement, claiming that it does not adequately remedy the § 2 violation. After conducting a hearing, in which the objectors as well as plaintiff class members favoring the settlement testified, the special master in this case, United States Magistrate John L. Carroll, recommended in each of these two cases that the court approve the settlement. For the reasons that follow, the court concludes that the magistrate's recommendations should be adopted.

I.

According to the 1980 census, Chilton County has a total population of 30,610.

---

1. These lawsuits are two among many *Dillard* cases, now pending in this court, challenging the at-large election systems and various features of those systems used by many cities, counties, and county school boards across Alabama. The plaintiffs in these *Dillard* cases have charged that these at-large systems violate § 2.

In *Dillard v. Baldwin County Board of Education,* 686 F.Supp. 1459 (M.D.Ala.1988), this court traced, in some detail, the evolution of these *Dillard* cases. These lawsuits against the Chilton County Commission and Board of Education are two of the "Group C" cases discussed there.

2. Section 2, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstances which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973.

Of that number, 11.86% are black. The black population is dispersed throughout the county.

Chilton County and its school system are currently governed by a five-member commission and a five-member board, respectively. The system used to elect the county commission and the school board has three structural features particularly relevant here. First, a candidate must run at-large, or countywide, with all voters in the county allowed to vote for the candidate. Second, a candidate must run for a "numbered post" or separate place. Each position carries a separate number, and each candidate qualifies for a specific number and place, with each voter allowed to vote for only one candidate in each place. And third, a candidate must receive a majority of votes cast in the primary to win the nomination of a political party. If no candidate receives a majority of votes, a run-off primary election is held. The majority-vote requirement does not apply to general elections.

To remedy the admitted § 2 violation, the plaintiffs, the commission and the school board have proposed a seven-member commission and a seven-member board of education elected by cumulative voting. Under this system, each voter has seven votes to cast among the candidates. However, a voter may distribute his or her votes in any way he or she desires. *See* Note, *Alternative Voting Systems as Remedies for Unlawful At–Large Systems*, 92 Yale L.J. 144, 153 (1982). For example, a voter could vote all seven votes for one candidate, four votes for one candidate and three for another, one vote for each of the seven different candidates, or in various other combinations. There are no majority-vote or numbered-post requirements.

Several members of the plaintiff class argue that the proposed settlement does not cure the § 2 violation, and they have proposed a single-member districting plan in its place.

## II.

■ Courts have often expressed a judicial policy favoring settlement as the means of resolving class-action lawsuits. *See, e.g., Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984); *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983). However, a district judge has a heavy obligation to ensure that any settlement is "fair, reasonable and adequate." *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986). The district judge also has a duty to ensure that the settlement is not illegal or against public policy. *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir.1980). The settlement here is fair, reasonable and adequate.

■ A violation of § 2 is established if official action was taken or maintained with a racially discriminatory "intent" or the action has racially discriminatory "results," determined according to certain Congressionally approved criteria. *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir.1984) (Former Fifth); *Buskey v. Oliver*, 565 F.Supp. 1473, 1481 & n. 18 (M.D.Ala.1983). The plaintiffs here have travelled on both theories against the Chilton County Commission and Board of Education.

### A.

■ As this court explained in some detail in its recent opinion in *Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala.1988), the Supreme Court recently set forth in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the manner in which a trial court should assess a § 2 results claim. The claim is established where the "totality of the circumstances," 42 U.S.C.A. § 1973(b), reveals that "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.* at 44, 106 S.Ct. at 2763, *quoting* S.Rep. No. 417, 97th Cong., 2d Sess. 28, *reprinted in* 1982 U.S. Code Cong. & Admin.News, 177, 206.

The *Thornburg* Court went on to list nine Congressional factors typically con-

sidered in evaluating a results claim.[3] The Court observed that the compilation of these factors is premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764–65.

The Court further observed that there is one significant limit on a results claim. A minority group has no right under § 2 to proportional representation; "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Id.* at 46, 106 S.Ct. at 2764. Rather, as stated, the plaintiffs must show that, under the totality of circumstances, the challenged electoral scheme results in an unequal access to the electoral process.

The *Thornburg* Court then refined the above general observations. The court held that, while all nine of the Congressional factors typically considered remain relevant, two circumstances are more important, and indeed are essential, to success on a § 2 results challenge. *Id.* at 47–52 & ns. 15 & 16, 106 S.Ct. at 2765–67 & ns. 15 & 16.

The Court required, as a first "precondition" to such a challenge, that the minority must be able to show that it experiences substantial difficulty electing representatives of its choice. To do this, it must show

the existence of "racially polarized voting": that is, that the minority group constitutes a politically cohesive unit and that the white majority votes sufficiently as a block, usually to defeat the minority's preferred candidate. *Id.* at 52, 55, 106 S.Ct. at 2767, 2769. If the minority group is not politically cohesive, it cannot be said that distinctive minority group interests are being thwarted, *id.;* and without significant white bloc voting, usually to defeat minority preferences, it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. *Id.* at 49 n. 15, 106 S.Ct. at 2766 n. 15. Indeed, for these reasons, racially polarized voting is viewed as the key element of a vote dilution claim. *Id.* at 54, 106 S.Ct. at 2769.[4]

The Court required, as a second precondition, that the minority be able to demonstrate that its difficulty in electing candidates of its choice is in some measure attributable to the challenged election feature, *id.* at 48, 106 S.Ct. at 2765, or, to put it another way, that the minority has the *potential* to elect representatives in the absence of the challenged feature. *Id.* at 50–51 & n. 17, 106 S.Ct. at 2766–67 & n. 17. Because the questioned choice here is between the county's present at-large system and a proposed cumulative voting system, the issue posed in this lawsuit is whether, under the proposed system, the black citi-

---

**3.** These factors are: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to effectively participate in the political process; (6) whether politi-

cal campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Thornburg,* at 35–38, 106 S.Ct. at 2759–60.

**4.** As this court further explained in *Baldwin County Board of Education,* at 1463, it cannot also be overlooked that racially polarized voting not only deprives minority voters of their preferred representatives, it also leaves them effectively unrepresented because it allows those elected to ignore minority interest without fear of political consequences. *See Thornburg,* 478 U.S. at 44 n. 9, 106 S.Ct. at 2763 n. 9.

zens of Chilton County have the potential to elect candidates of their choice.[5]

The parties admit that there is racially polarized voting in Chilton County. Therefore, the critical issue for the court, in its assessment of the settlement proposed by the parties, is whether the black voters in the county have under the settlement the potential to elect representatives of their choice, even in the face of such voting patterns. In determining whether the settlement offers such, the court will apply a concept known as "threshold of exclusion."

The threshold of exclusion "is the percentage of the vote that will guarantee the winning of a seat even under the most unfavorable circumstances." Lijphart, Pinter & Sone, *The Limited Vote and the Single Nontransferable Vote: Lessons from the Japanese and Spanish Examples*, in Electoral Law and Their Political Consequences 154, 157 (B. Grofman & A. Lijphart eds. 1986). The worst case scenario that defines the threshold of exclusion is based on two assumptions. The first is that the majority sponsor only as many candidates as there are seats to be filled; for example, in a seven-seat jurisdiction, only seven majority-preferred candidates would run. The second is that the majority spread its votes evenly among its candidates, with no "crossover voting" for the minority-preferred candidate. If either of these assumptions is relaxed, then it is entirely possible for the minority candidate to win even if the minority does not constitute more than the threshold of exclusion in turnout.

There is a calculable threshold of exclusion for any election scheme. For example, in an at-large system, such as the one used in Chilton County, the threshold of exclusion is more than 50%. Any group that constitutes more than 50% of the electorate in that district—that is, a group of "50% plus"—is guaranteed that its preferred candidate will win. Of course, in a plurality-win at-large district, as opposed to a

district with a majority-vote requirement, a group with less than 50% plus of the electorate can elect its preferred candidate in certain cases. For example, a group constituting 40% of the electorate might elect its candidate in a three-way contest where the other 60% of the electorate spreads its votes between the other two candidates, each of whom receives 30%. However, although a group that constitutes less than 50% plus of the population in an at-large jurisdiction may, in some cases, elect its preferred candidate, the threshold of exclusion remains 50% plus; that is, a group of 50% plus, by voting strategically—sponsoring only as many candidates as there are seats and voting for the entire majority-sponsored slate—can totally shut out the minority.

In a cumulative voting system, however, the threshold of exclusion is dependent on the number of seats to be filled in a given election. It can be expressed as

$$\text{``}\frac{1}{1 + \# \text{ of seats}} \text{ plus.''}$$

Thus, in a jurisdiction with seven seats, the threshold of exclusion would be 12.5% plus. If 1000 electors vote for seven positions, and if there is a worst case scenario, only seven candidates preferred by the majority, with an evenly split vote, a minority would need only 876, or 12.51% of the 7000 votes, to elect the candidate of their choice.

The threshold of exclusion concept should not, however, be applied in a vacuum. Section 2 requires that, in evaluating vote dilution claims, a court must engage in "a searching practical evaluation of 'past and present reality.'" *Thornburg*, at 78, 106 S.Ct. at 2781, *quoting* S.Rep. No. 417, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.Code Cong. & Admin.News, 177, 208 (footnote omitted). A court must look not to just the worse case scenario or the best scenario, but to the totality of the circumstances, to the social and economic as well as the political circumstances of the juris-

---

5. Because the questioned choice in *Thornburg* was in the context of a majority vote requirement and because it was between an at-large system and a scheme with a majority-black single-member district, the Supreme Court logical-

ly required that "the minority group ... be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766.

diction in which the election system has been, or will be, used. In actual settings, the above two assumptions will exist in varying degrees; and, more than likely, there will be other factors that impede or facilitate the access of minorities to the political process. Therefore, based on a particular jurisdiction's totality of circumstances, a questioned election system may very well not be adequate for the jurisdiction, even though the percentage of black voters in the jurisdiction exceeds the threshold of exclusion for the system; and, conversely, the system may very well be fully adequate in another jurisdiction, even though the percentage of black voters in that jurisdiction is less than the system's threshold of exclusion. The threshold of exclusion concept is therefore not an automatic cut-off point, but rather is a broad guideline which may be helpful in assessing the impact on minorities of present and proposed election systems.

Under the present at-large system used to elect the Chilton County Commission and Board of Education, the threshold of exclusion is 50% plus. Because the percentage of blacks in the county, 11.86, does not even approach this threshold and because there is extensive racial polarization in the county, black voters in the county do not have a realistic opportunity to participate in the political process and elect candidates of their choice.

In contrast, the cumulative voting system proposed by the parties does offer black voters in the county such an opportunity. Admittedly, the percentage of blacks, 11.86, in the county is less than the threshold and, admittedly, if the black voters cumulate their votes, they will not be able to elect a representative under the worse case scenario. But it also cannot be overlooked that the percentage of black citizens in the county approaches the threshold of exclusion. Looking at the totality of the circumstances in Chilton County, the parties urge, and the court agrees, that the system does offer black voters in the coun-

ty the potential to elect candidates of their choice to the county commission and school board, even in the face of substantial racially polarized voting.

### B.

The court has also found in another, connected proceeding that, for the purpose of minimizing black voting strength, the Alabama legislature reshaped local at-large election schemes by enacting "anti-single shot" laws in the 1950's and by replacing those laws in 1961 with "numbered place" laws. The court also found that the legislature engaged in a century-long pattern and practice of switching between local at-large election systems and local single-member district systems as needed to diminish black voting strength. *Dillard v. Crenshaw County*, 640 F.Supp. 1347 (M.D. Ala.1986); *see also Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala.1988); *Dillard v. Baldwin County Commission*, 694 F.Supp. 836 (M.D.Ala.1988). The at-large system used to elect the Chilton County Commission and Board of Education was a product of this state-wide legislative scheme to deny Alabama black citizens their right of equal access to the state's political process.

The cumulative voting system proposed by the parties cures the plaintiffs' § 2 claims to the extent the claims rest on intentional discrimination. For the reasons given above, the system provides black voters in the county with a realistic opportunity to elect candidates of their choice, even in the presence of substantial racially polarized voting.

### III.

As stated above, the court must address whether the cumulative voting scheme proposed by the parties is illegal or against public policy. There is nothing in federal constitutional or statutory law that prohibits its use. The scheme is acceptable under federal law.[6]

---

6. In assessing the fairness of a proposed settlement, a court should also consider the judgment of counsel. The principal attorneys representing the plaintiffs in this case have successfully handled countless suits of this type in Alabama and Florida. The court thus gives great weight

## IV.

 Finally, the six members of the plaintiff class, who objected to the cumulative vote proposal, have submitted a single-member districting scheme of their own. The objectors ignore the demographics of Chilton County. As previously noted, black persons comprise only 11.86% of the population of Chilton County, and they are dispersed throughout the county. It is impossible to draw a five or seven single-member district plan which both has a majority black district and satisfies the one-person-one-vote requirement. For example, the objectors presented a five single-member district plan to the court, with most of the black citizens included in one district. However, that district would have a total population of approximately 11,000, making it roughly twice the size of an ideal district. The plan obviously fails to satisfy the one-person-one-vote requirement. *See, e.g., Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975) (court-ordered plans must normally meet the goal of population equality with little more than de minimus variation).

## V.

In conclusion, the court holds that the cumulative voting system proposed by the parties is an acceptable remedy for the claimed § 2 violations. For Chilton County, the system is fair, reasonable, and adequate and is not illegal or against public policy.[7]

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the objections to the recommendations of the United States Magistrate, recommending approval of a settlement incorporating a "cumulative voting" scheme for electing members of the Chilton County Commission and Chilton County Board of Education, be and they are hereby overruled;

(2) That the recommendations of the United States Magistrate be and they are hereby adopted; and

(3) That the settlement proposal of the parties be and it is hereby approved.

---

to their representation that the settlement represents a fair and equitable solution to this litigation.

**7.** Cumulative voting is not an unusual remedy in these *Dillard* cases, and thus is becoming rather common in Alabama. The court has already approved the adoption of cumulative voting for Centre, Alabama, in *Dillard v. City of Centre*, Civil Action No. 87–T–1174–N, and the court has, pursuant to Fed.R.Civ.P. 23(e), set fairness hearings on proposed settlements adopting cumulative voting in *Dillard v. City of Guin*, Civil Action No. 87–T–1225–N, and *Dillard v. Town of Myrtleswood*, Civil Action No. 87–T–1263–N.