John DILLARD, et al., Plaintiffs,

v.

TOWN OF LOUISVILLE, Defendant.

Civ. A. No. 87–T–1249–N.

United States District Court,
M.D. Alabama, N.D.

Feb. 7, 1990.

James U. Blacksher, Birmingham, Ala., Edward Still, Reeves & Still, Birmingham, Ala., Julius L. Chambers, Scherlyn Ifill, NAACP Legal Defense Fund, New York City, for plaintiffs.

Don Siegelman, Alabama Atty. Gen., Office of Atty. Gen., David Boyd, Balch & Bingham, Montgomery, Ala., Boyd Whigham, Clayton, Ala., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This cause is now before the court on a noteworthy redistricting plan submitted by an Alabama town subsequent to its admission that the present at-large system used to elect its council members violates § 2 of the Voting Rights Act of 1965, as amended.[1] The proposed plan provides for five single-member districts, of which two

---

**1.** Section 2 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or elec-

tion in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973.

are predominantly African–American both as to voting age and population; the remarkable feature in the plan is that one of the majority-black districts is "non-contiguous" or split.[2] For reasons that follow, the court finds that the town's proposed remedy is acceptable under § 2.

### I.

The plaintiffs, who represent a class composed of all African–American citizens residing in the Town of Louisville, have brought this lawsuit, charging that the town's present at-large election system impermissibly dilutes the voting power of plaintiff class members.[3] Louisville is located in Barbour County in southeastern Alabama. According to the 1980 United States Census, the town had a total population of 791, of which approximately 43% was African–American. Town officials and a representative of the Alabama Democratic Conference, an African–American political organization, conducted a population count in 1987 which reflected that the town had a population of 735, of which approximately 44.5% was African–American. This 1987 count also reflected that African–Americans formed approximately 34.3% of the voting-age population.

Under Louisville's present electoral system, a candidate for town council must run at-large, or city-wide, with all voters in the town allowed to vote for the candidate. A candidate must also run for a numbered post or separate place; that is, each position carries a separate number, and each candidate qualifies for a specific number and place, with each voter allowed to vote for only one candidate in each place. A candidate must receive a majority of votes

cast in the primary to win the nomination of a political party. If no candidate receives a majority of votes, a run-off primary is held. The majority requirement does not apply to general elections.

Section 2 of the Voting Rights Act proscribes all forms of voting discrimination, including both governmental action taken with the "intent" of inhibiting a person's right to vote on the basis of her race, and governmental action which has racially discriminatory "results." *Thornburg v. Gingles*, 478 U.S. 30, 44–45 & n. 10, 106 S.Ct. 2752, 2763 & n. 10, 92 L.Ed.2d 25 (1986); *McMillan v. Escambia County, Florida*, 748 F.2d 1037, 1046 (Former 5th Cir.1984). Louisville admitted at an earlier stage of this lawsuit that its electoral system violates § 2 in both respects, although the parties initially were unable to agree on an appropriate remedy.[4]

Louisville has proposed a new electoral plan for its town council consisting of a five single-member districts, with the mayor elected at large. As stated, a notable characteristic of Louisville's proposed plan is that one of the two districts with majority-black populations is non-contiguous or split.[5] The plaintiffs objected to this feature and argued that Alabama law prohibited non-contiguous districts. They proposed an alternative plan consisting of two multi-member districts, with two council member coming from one district and three from the other. The two-member district in the plaintiffs' plan would have a large black majority.

United States Magistrate John L. Carroll, the special master in this case, conducted a hearing on the issue of relief and has rec-

---

**2.** "A district may be defined as contiguous if every part of the district is reachable from every other part without crossing the district boundary (i.e., the district is not divided into two or more discrete pieces)." Grofman, *Criteria for Districting: A Social Science Perspective,* 33 U.C. L.A.L.Rev. 77, 84 (1985).

**3.** This lawsuit is one among many *Dillard* cases brought in this court, challenging the at-large election systems and various features of those systems used by cities, counties, and county school boards across Alabama. *See Dillard v. Baldwin County Board of Education,* 686

F.Supp. 1459 (M.D.Ala.1988) (retracing the history of the *Dillard* litigation).

**4.** *See Dillard v. Baldwin County Board of Education,* 686 F.Supp. at 1461 (explaining the division of this and other *Dillard* cases into certain categories, depending on the litigating posture of the defendants).

**5.** Attached to this memorandum opinion as an appendix is a copy of Louisville's districting plan. Districts I and V have majority black populations.

ommended that the court adopt the town's proposed plan rather than the plaintiffs'. The plaintiffs have, however, withdrawn their objection to Louisville's plan and now appear to agree that the town's plan should be approved and implemented.[6] The United States Department of Justice has also "precleared" the plan pursuant to § 5 of the Voting Rights Act of 1965, as amended.[7]

## II.

■ The importance of settlements in the resolution of class-action lawsuits in general, and in voting rights cases in particular, cannot be overstated. This court has repeatedly noted the judicial policy favoring settlement in these cases. *See, e.g., Dillard v. Town of Cuba,* 708 F.Supp. 1244 (M.D.Ala.1988); *Dillard v. Chilton County Board of Education,* 699 F.Supp. 870 (M.D.Ala.1988). However, the district court bears the heavy responsibility of ensuring that the proposed settlement is fair, reasonable, and adequate as to the entire plaintiff class, and that it comports with the law and public policy. *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *United States v. City of Alexandria,* 614 F.2d 1358, 1361–62 (5th Cir.1980). The electoral system proposed by the parties in this case meets these standards.

Single-member districting plans are a common, though not exclusive, remedy in § 2 cases arising out of the dilution of minority voting rights by an at-large electoral scheme.[8] At-large schemes "tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district." *Rogers v. Lodge,* 458 U.S. 613, 616, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982) (emphasis in original).[9] When the community suffers from racial polarization in voting—and especially when the system is supplemented by mechanisms such as majority vote requirement laws, anti-single shot voting laws, and numbered place laws—at-large systems can be potent tools for those seeking to deny minorities participation in the community's political operation.[10] The relative virtue of a single-member district system is that a district's representative is selected only by the voters of that district.

■ Therefore, if a scheme can be fashioned in which a sufficient majority of the voters in one or more districts belongs to the previously submerged minority group, the illegal discriminatory effects of racially polarized voting can be overcome, and members of that minority group may enjoy a meaningful opportunity to participate in the governmental process and to elect a candidate of their choice. Partly for these reasons, a single-member districting scheme is the preferred remedy in voting rights cases, absent alternative proposals by the *offending* jurisdiction which remedy the violation, or other special circumstances which make the single-member districting scheme an inadequate remedy. *E.g., Rogers,* 458 U.S. at 627–28, 102 S.Ct. at 3281.[11]

---

**6.** Because, as explained later, Louisville's proposed plan provides a complete and legally acceptable remedy to the § 2 violation and since the plaintiffs have withdrawn their objection to the town's plan, the court need not discuss the merits of the plaintiffs' proposed plan.

**7.** 42 U.S.C.A. § 1973c.

**8.** Not all the court-approved settlements in the *Dillard* cases involved single-member districts. *See, e.g., Dillard v. Town of Cuba,* 708 F.Supp. 1244 (M.D.Ala.1988) ("limited voting" scheme is acceptable § 2 remedy); *Dillard v. Chilton County Board of Education,* 699 F.Supp. 870 (M.D.Ala.1988) ("cumulative voting" scheme is acceptable § 2 remedy).

**9.** *See also Thornburg v. Gingles,* 478 U.S. 30, 85–87, 106 S.Ct. 2752, 2783–85, 92 L.Ed.2d 25 (1986) (O'Connor, J., joined by Burger, C.J., Powell & Rehnquist, JJ., concurring in the judgment) (using a model to demonstrate tendency to submerge minority group).

**10.** *See, e.g., Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986) (reviewing history of efforts by the Alabama legislature to fashion local electoral structures with the intent to preclude participation of black citizens).

**11.** *See also United States v. Dallas County Commission,* 850 F.2d 1433 (11th Cir.1988) (rejecting plan adopted by district court, which included at-large elements, in favor of plan proposed by

Of course, any voting scheme must also satisfy other legal norms, most notably the one-person-one-vote requirement. *See, e.g., Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *Dillard v. Chilton County Board of Education,* 699 F.Supp. at 876.

■ In the case of Louisville, no single-member scheme can be devised under current population conditions that will meet all these concerns—that it consist of only contiguous districts, that it comply with the requirement of one-person-one-vote, and that it enable blacks within the town to elect candidates of their choice in at least two districts. The town's proposed solution to this problem is its plan featuring one district that is non-contiguous. Louisville's solution is appropriate and, indeed, necessary.

As a general rule, federal courts faced with the task of fashioning new districting systems should attempt to draw district lines "with an eye to compactness, contiguousness, and the preservation of natural, political, and traditional boundaries." *Marshall v. Edwards,* 582 F.2d 927, 937 (5th Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). This guideline does not reflect an aesthetic preference among the judiciary for rectangular designs. Rather, these characteristics serve as proxies for the more substantial values of a sense of community within the jurisdiction and relative ease of citizens to identify their elected representatives. *See Dillard v. Baldwin County Board of Education,* 686 F.Supp. 1459, 1466 (M.D.Ala. 1988). Louisville designed the plan at issue, and the town apparently believes that the plan, despite its non-contiguousness, accommodates a sense of community within

each district. The town's familiarity with its own practical needs warrants substantial deference from the court.

Moreover, it is now settled in this circuit that a trial court may not adopt a remedy that does not itself "completely" and "with certitude" cure the § 2 violation. *Dillard v. Crenshaw County,* 831 F.2d 246, 252 (11th Cir.1987). Concern for contiguity and compactness, therefore, may serve as a guide only once the court has assured itself that the proposed remedy does not dilute minority political strength. *Marshall,* 582 F.2d at 937. The virtues of compactness and contiguity cannot override the court's statutory and constitutional obligation to provide a complete remedy if possible.[12] *United States v. Dallas County Commission,* 850 F.2d 1433, 1438 (11th Cir.1988) (quoting S.Rep. No. 417, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 208). Louisville's plan completely and with certitude remedies the § 2 violation in the town's electoral system. The court is convinced that, in spite of the substantial racially polarized voting that apparently exists in the town, the plan offers the community's African–American citizens the potential to elect two city council members of their choice.

Finally, three other considerations reinforce the court's conclusion that Louisville's plan is fair, reasonable, adequate and legal. First, although given notice of the proposed plan and an opportunity to object to it, none of Louisville's African–American citizens has objected. Second, plaintiffs' attorneys, who are well-respected practitioners in voting rights cases, have withdrawn their objection to the plan and now support it. And third, the court has

United States, which exclusively used single-member districts).

12. As this court has stated before:
By compactness, *Thornburg* does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness.... It is apparent from the *Thornburg* opinion that compactness is a relative term tied to certain practical objectives under § 2; the requirement is not that a district be compact, but that it be "suffi-

ciently" compact under § 2. The term is a "practical" or "functional" concept, which must be tied to § 2's laudatory national mission of opening up the political process to those minorities that have traditionally been denied such [participation] ... [Compactness] is therefore a desirable consideration for districting, but only to the extent it aids or facilitates the political process, and only as one among many considerations [for] a court.
*Dillard v. Baldwin County Board of Education,* 686 F.Supp. at 1465–66.

been unable to uncover anything that would indicate that the plan, including its non-contiguousness, conflicts with the law or policy of the State of Alabama or the United States.

## III.

In conclusion, Louisville apparently recognizes that the bottom line in § 2 litigation is whether African–Americans have an equal opportunity, in the words of the Voting Rights Act, "to participate in the political process and to elect representatives of their choice." Courts therefore should be flexible and sensitive to the human issues presented, and should not seek to apply rigid, abstract formulas divorced from real-ity.[13] With these principles in mind, Louisville commendably proposed a novel remedy when a conventional one would not work. The town apparently appreciated, as should courts and other § 2 participants, that this is a very small price to pay in order to help bring to an end the centuries of political, social and economic degradation to which African–American citizens of this state have been subjected.[14]

The court holds that, under the totality of circumstances, the plan proposed by the Town of Louisville is an acceptable remedy for its admitted § 2 violation. For Louisville's African–American citizens, the plan is fair, reasonable, and adequate, and it is not illegal or against public policy.[15]

**13.** Congress clearly suggested that a court's approach should be flexible and sensitive and not rigid, when it expressly stated in the statute that a § 2 violation is measured by the "totality of the circumstances," and when it indicated in the history of the statute that the following nine factors typically should be considered: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The Supreme Court similarly recognized the need for flexibility and sensitivity when it adopted the above nine factors, but noted that they are neither comprehensive nor exclusive, and that courts may consider other factors that may be relevant. There is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other. *Thornburg,* 478 U.S. at 45, 106 S.Ct. at 2763–64. The Court further indicated that "the question whether the political processes are 'equally open' depends upon a searching evaluation of the 'past and present reality,'" and "on a 'functional' view of the political process." *Id.,* quoting S.Rep. No. 417, at 30 n. 120, 1982 U.S. Code Cong. & Admin.News at 208.

To be sure, the Court in *Thornburg* refined these general observations to adopt a test for the specific governmental decision challenged in that case. It is, however, apparent from the above language that the Court was not seeking to straitjacket the analysis of all § 2 claims into one rigid formula.

**14.** In an earlier phase of the *Dillard* litigation, this court issued an opinion detailing, with extensive documentation, the history of Alabama's government-enforced racial discrimination and the continued effects of that discrimination. *Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986).

**15.** The court is aware that at least one commentator has implicitly expressed concern over the authority of the federal courts to remedy § 2 violations in the manner suggested by Louisville and approved by this memorandum opinion. Noting the difficulties in focusing solely on single-member districting schemes as remedies in § 2 cases, Professor Blumstein writes that "In the absence of residential segregation, one wonders whether the courts would mirror the school desegregation remedies. One can envision a court's mandating racial gerrymanders or noncontiguous zones in order to achieve black majority districts. That type of remedial order would turn the districting in *Gomillion v. Lightfoot,* 364 U.S. 339 [81 S.Ct. 125], 5 L.Ed.2d 110 (1960), on its head." Blumstein, *Defining and Proving Race Discrimination: Perspectives on the Purpose vs. Results Approach from the Vot-*

An appropriate judgment will be entered. DONE.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the recommendation of the United States Magistrate be and it is hereby adopted;

(2) That it be and it is hereby DECLARED that the current at-large system used to elect the members of defendant Town of Louisville's city council violates § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973; and

(3) That defendant Town of Louisville, its officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and each is hereby RESTRAINED and ENJOINED:

(A) From using the town's present at-large election system in any future elections;

(B) From failing to implement the town's submitted single-member redistricting plan, consisting of five districts; and

(C) From failing to conduct all future elections for city council members under the new plan.

It is further ORDERED that the plaintiffs have and recover from defendant Town of Louisville their reasonable attorney fees, and that the plaintiffs be and they are hereby allowed until the completion of all the *Dillard* cases to file their request for attorney fees.

It is further ORDERED that costs be and they are hereby taxed against defendant Town of Louisville, for which execution may issue, and that plaintiffs be and they are hereby allowed until the completion of all the *Dillard* cases to file their bill of costs.

---

*ing Rights Act,* 69 Va.L.Rev. 633, 710 n. 372 (1983).

*Gomillion* arose out of an attempt by the State of Alabama, in 1957, to alter the boundaries of the City of Tuskegee from a square shape to a tortured 28–sided figure in order to deprive African–American residents of the city of any opportunity to participate in their governance. As the Court observed, "The essential inevitable effect of this redefinition of Tuskegee's boundaries is to remove from the city all save only four or five of its 400 Negro voters while not removing a single white voter or resident." 364 U.S. at 341, 81 S.Ct. at 127. "While in form this is merely an act redefining metes and bounds," the Court continued, "if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights." *Id.* at 347, 81 S.Ct. at 130. The Court rejected the assertion that a federal court could not review Alabama's compliance with the constitutional rights of *all* its citizens and provide appropriate relief for infringements on those rights. Rather, after reviewing the relevant authority, the Court stated "that [it] has never acknowledged that the States have power to do as they will with municipal corporations *regardless of consequences.*" *Id.* at 344, 81 S.Ct. at 129 (emphasis added). The Court reasserted the critical responsibility of the federal courts to determine whether the "state['s] power is [being] used as an instrument for circumventing a federally protected right." *Id.* at 347, 81 S.Ct. at 130.

*Gomillion* therefore stands for the principle that a court must not turn a blind eye to the effects of voting district composition on the ability of all members of the community to participate in their government. Far from condemning Louisville's attempt to structure a political system open to participation by all of its residents, *Gomillion* mandates this court's consideration of the human implications of the proposal—of whether the plan's boundaries serve to exclude black citizens from the political process or to remedy that exclusion.