**TEXAS RURAL LEGAL AID, INC.,**
**et al., Plaintiffs,**

v.

**LEGAL SERVICES**
**CORPORATION, Defendant.**

**Civ. A. No. 89–3442.**

United States District Court,
District of Columbia.

June 25, 1990.

---

**3.** Plaintiffs contend that defendants Salley Hunt and J.D. Clem should be dismissed from the case.

Paul Nielsen, Richard J. Oparil, Linda E. Perle, Washington, D.C., for plaintiffs.

Charles J. Cooper, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

Plaintiffs in this action are three independent local legal aid organizations participating in programs to assist the poor. Each receives funds from the defendant, Legal Services Corporation ("LSC"), a non-profit District of Columbia corporation created by the Legal Services Corporation Act of 1974, as amended, 42 U.S.C. § 2996 et seq. (the "LSC Act"). Plaintiffs seek to set aside a Final Rule, published by LSC, 54 Fed.Reg. 31954 (Aug. 3, 1989) (the "Final Rule"), that prohibits them from participating in redistricting cases approved by their respective boards under the statutory scheme. Cross-motions for summary judgment have been thoroughly documented, briefed and argued.

### The Court has jurisdiction

LSC asserts that it is accountable only to Congress and challenges the Court's jurisdiction to review its actions. However, the Court holds that it has federal question jurisdiction pursuant to 28 U.S.C. § 1331. This holding is amply supported by rulings in analogous circumstances. *See, e.g., San Juan Legal Services, Inc. v. Legal Services Corp.,* 655 F.2d 434 (1st Cir.1981); *Spokane County Legal Services, Inc. v. Legal Services Corp.,* 614 F.2d 662 (9th Cir.1980); *National Paralegal Institute v. Legal Services Corp.,* C.A. No. 76–1260 (D.D.C. August 12, 1976). Moreover, the Court of Appeals for this Circuit has assumed, without directly addressing the point, that such jurisdiction exists. *National Clearinghouse for Legal Services, Inc. v. Legal Services Corp.,* 674 F.Supp. 37 (D.D.C. 1987), *aff'd mem.,* 861 F.2d 303 (D.C.Cir. 1988).[1]

---

1. There might also be jurisdiction based on diversity of citizenship. Affected parties can hold a D.C. non-profit corporation liable for breach of fiduciary duty. *See Stern v. Lucy Webb Hayes National Training School,* 381 F.Supp. 1003 (D.D.C.1974). LSC's certificate of incorpo-

Each of the plaintiffs represents clients in current, ongoing redistricting cases which are prohibited by the challenged Final Rule.

## The statutory scheme

Before directly addressing the merits, it is necessary to emphasize the nature of the underlying statutory scheme:

First, there can be no dispute as to the intended purpose of the LSC Act. Congress sought to provide "financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a). This purpose is developed and explicated fully by a series of congressional findings in the Act:

(1) there is a need to provide equal access to the system of justice in our Nation for individuals who seek redress of grievances;

(2) there is a need to provide high quality legal assistance to those who would be otherwise unable to afford adequate legal counsel and to continue the present vital legal services program;

(3) providing legal assistance to those who face an economic barrier to adequate legal counsel will serve the best ends of justice and assist in improving opportunities for low-income persons consistent with the purposes of this chapter;

(4) for many of our citizens, the availability of legal services has reaffirmed faith in our government of laws;

(5) to preserve its strength, the legal services program must be kept free from the influence of or use by it of political pressures; and

(6) attorneys providing legal assistance must have full freedom to protect the best interests of their clients in keeping with the Code of Professional Responsibility, the Canons of Ethics, and the high standards of the legal profession.

42 U.S.C. § 2996.

Second, it is apparent from the face of the statute that, prior to adoption of the Final Rule, LSC-funded organizations were not prohibited from accepting redistricting cases as a means of effectuating these broad purposes. Congress itself chose in the exercise of its legislative authority to specify the categories or types of activities prohibited under the LSC Act. The statute specifically provides, at § 2996f(b) that LSC shall not make available funds for ten categories of activities:

(1) certain fee-generating cases;

(2) felony criminal cases;

(3) habeas corpus-type cases;

(4) (A) political activity, (B) transporting voters to polls or "similar assistance in connection with an election (other than legal advice and representation)," and (C) "any voter registration activity (other than legal advice and representation)";

(5) grants or contracts with certain private law firms;

(6) training programs for the purpose of advocating political or labor activity, except that this provision "shall not be construed to prohibit" training of attorneys to prepare them to provide legal assistance;

(7) formation or organization of any association, "except that this provision shall not be construed to prohibit" provision of legal assistance;

(8) most abortion cases;

(9) school desegregation cases, "except that nothing in this paragraph shall prohibit" counseling clients as to their legal rights; and

(10) most Selective Service cases.

Subsequent to enactment of the LSC Act, Congress has continued to determine what types of litigation are inappropriate for recipients by enacting further case type restrictions in LSC appropriations acts. These presently include bans on class ac-

---

ration provides that LSC's "purposes ... powers, duties, and limitations" are only those set forth in the LSC Act. LSC's by-laws contain a similar provision. 45 CFR § 1601.2. Thus plaintiffs' allegation that LSC has violated the LSC Act appears to present a fiduciary duty claim.

tion suits under certain circumstances, lobbying not focused on the specific legal needs of clients, and legal assistance to certain classes of aliens. *See* Departments of Commerce, Justice and State, the Judiciary and Related Agencies Appropriation Act, 1990, Pub.L. No. 101–162, 103 Stat. 988, 1032–37 (1989).

In addition, under 42 U.S.C. § 2996f(a), LSC is charged with insuring that no LSC funds are expended to influence legislation or executive orders except where (a) such action is necessary to the provision of legal services affecting a client's legal rights and responsibilities; (b) where a government body or officials requests assistance or testimony; or (c) where government is considering a measure directly affecting LSC or recipient activities. LSC is also specifically charged with insuring recipient compliance with the "political activity" and voting restrictions contained in 42 U.S.C. § 2996f(b)(4) and described above. Thus to the extent LSC itself is mentioned in these case restriction provisions it is only authorized to effectuate specific congressional goals, none of which suggest the authority to ban redistricting cases. Indeed, the prohibitions of § 2996f(b)(4) specifically exempt the provision of legal services from the bans on recipient involvement in voting activities.

At no time has Congress taken any action to bar redistricting activities. Moreover, it is apparent from the record that redistricting litigation can in particular circumstances affirmatively effectuate the overall congressional purpose of providing legal aid to the poor. *See* note 4, *infra,* and Memorandum on Behalf of *Amici Curiae* NAACP Legal Defense and Educational Fund, Inc., and Lawyers' Committee for Civil Rights Under Law.

Third, Congress recognized from the outset that the purposes of the LSC Act could best be advanced by local organizations which would guide case selection so as to focus on particular problems of special consequence in respective areas of the country. Thus it is not surprising that redistricting litigation has been considered significant in some localities and not others, as is the case with other forms of legal work within the limits set by the statute. Indeed, the special role of the local organizations in shaping the focus of LSC-assisted efforts in a manner best suited to accomplish the goals of the LSC Act has been repeatedly recognized and emphasized.

An amendment to the Act adopted in 1977 resolved any uncertainty as to the intended key role of local organizations in selecting their own cases. The amendment by its terms made clear that local recipients—and not LSC—had the power to set local priorities. Prior to the amendment, the Act directed LSC to "establish priorities to insure that persons least able to afford legal assistance are given preference in the furnishing of such assistance." As amended, this provision authorizes LSC only to

> **insure that (i) recipients, consistent with goals established by the Corporation, adopt procedures for determining and implementing priorities for the provision of [legal] assistance,** taking into account the relative needs of eligible clients for such assistance (including such outreach, training and support services as may be necessary), including particularly the needs for service on the part of significant segments of the population of eligible clients with special difficulties of access to legal services or special legal problems (including elderly and handicapped individuals); and (ii) appropriate training and support services are provided in order to provide such assistance to such significant segments of the population of eligible clients.

42 U.S.C. § 2996f(a)(2)(C) (emphasis added).

The difference between this present language of section 2996f(a)(2)(C) and the provision as originally enacted in 1974 suggests a deliberate effort to make clear that recipients, not LSC, have control over the types of cases to be accepted. LSC was left with the task of establishing *goals* for adopting and insuring that recipients adopted *procedures* by which recipients would themselves set priorities. At most LSC retains an advisory role with respect to the substance of caseload priorities while

recipient organizations hold actual decision-making power.

The committee reports accompanying the 1977 amendment make clear that this interpretation is correct. The House report states:

> Reference to goals that may be established by the Corporation permits the Corporation to set as goals the provision of legal assistance in the most effective manner, or so as to have the greatest effect on the problems of poor people, or other similar goals. The reference is not intended to detract from the rightful role of local programs, in consultation with local client communities, to set priorities concerning the substantive law matters to which scarce program resources are to be allocated.

H.R.Rep. No. 310, 95th Cong., 1st Sess. 11 (1977), U.S.Code Cong. & Admin.News pp. 4503, 4512, 4513. The Senate report expresses the same view:

> ... the Corporation is authorized to establish national goals for all recipient programs. This provision is not intended to detract from the appropriate role of local programs, in consultation with local client communities, to set priorities concerning the substantive law matters to which scarce program resources are to be allocated, taking into account relative needs of clients in the area for legal services.

S.Rep. No. 172, 95th Cong., 1st Sess. 13 (1977).

There is other evidence that Congress intended that recipients be permitted to select their cases free of LSC control and subject only to congressional prohibitions. The LSC Act regulates the composition of recipient boards, requiring that at least 60 percent of board members be attorneys of the bar of a state in which the recipient provides legal aid and at least 33 percent be eligible clients. 42 U.S.C. § 2996f(c). In addition, LSC appropriations acts since 1984 have required that the majority of a local board be selected by area bar associations. Pub.L. No. 101–162, *supra*, § 608, 103 Stat. at 1035. This clear concern with the make-up of recipient boards is another indication that Congress expected that the boards, not the LSC, would be determining the content of the caseload. If the local boards were intended as mere puppets of the LSC, Congress would likely not have been so concerned over who controlled them.[2]

### *The challenged final rule*

■ With the statutory scheme thus outlined, the Court will consider the Final Rule as issued before analyzing its purported justification.

The Final Rule, effective September 5, 1989, prohibits LSC and any LSC grantee or contractor from "advocating or opposing any plan, proposal, or litigation intended to or having the effect of altering any redistricting at any level of government." 45 CFR section 1632.3. "Redistricting" is defined as "any effort, directly or indirectly, to participate in the revision or reapportionment of a legislative, judicial, or elective district at any level of government, including influencing the timing or manner of the taking of a census." 45 CFR § 1632.2. "Advocating or opposing any plan" is defined as "any effort, whether by request or otherwise, even if of a neutral nature, to revise a legislative, judicial or elective district at any level of government." *Id.*

A separate provision of the Final Rule indicates that it does not prohibit (a) litigation under the Voting Rights Act that "does not involve redistricting"; (b) the expenditure of public or tribal funds used for purposes for which they were provided; (c) activities undertaken by recipient employees on their own time and not with recipient resources or under recipient auspices. 45 CFR § 1632.4. Except for the public or tribal funds exception of section 1632.4(b), the Final Rule represents an absolute ban on redistricting activities by any

---

**2.** At the same time, Congress has by statute, Pub.L. No. 101–162, *supra*, § 608, 103 Stat. at 1036, prohibited LSC from imposing its own further restrictions on local recipient boards.

In enacting this provision, Congress effectively overruled regulations proposed by LSC, *see* 52 Fed.Reg. 38900 (*Oct. 19, 1987*), that sought to impose such restrictions.

organization that takes LSC funds; there is no exemption even for redistricting work financed by private contributions.

Moreover, as interpreted by the LSC, the Final Rule does not "grandfather" existing redistricting litigation; LSC has for the most part directed recipients who have inquired to terminate their present, ongoing representation in such cases.

LSC's central justification for the Final Rule is that "redistricting activities are not consistent with the Corporation's principal national goal of providing basic day-to-day services to eligible poor individuals." 54 Fed.Reg. 31957. LSC asserts that as to redistricting work, "the benefits to the poor are often attenuated and entangled with social or political issues." Id.

### LSC lacks authority to enact the Final Rule

There is no indication in the LSC Act or its legislative history that Congress intended to delegate its legislative power to LSC to prohibit categories of litigation beyond those Congress itself had banned. LSC makes no such specific claim, although that is in effect what it has done. Rather LSC seeks to extend authority to accomplish this precise result from language that authorizes its limited administrative role, distorting the text of the LSC Act into a grant of almost unlimited policy control of the entire program. In so doing, LSC has exceeded its authority and usurped the powers of Congress.

The disputed Final Rule is clearly a legislative rule, i.e. it alters existing rights and obligations and is not simply a restatement of consistent agency interpretation of a statute. *See General Motors Corp. v. Ruckleshaus*, 742 F.2d 1561, 1565 (D.C.Cir. 1984) (*en banc*), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *American Postal Workers v. United States Postal Service*, 707 F.2d 548 (D.C. Cir.1983), *cert. denied*, 465 U.S. 1100, 104

S.Ct. 1594, 80 L.Ed.2d 126 (1984). Recipients of LSC funds clearly understood prior to adoption of the Final Rule that they were permitted to do redistricting work. Under the Final Rule, they are prohibited from doing such work. "The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979).[3] LSC's effort to prohibit recipients from accepting redistricting cases is not rooted in any congressional grant of power.

Looking at the Act as a whole makes clear the mainly administrative role of LSC; the Act charges LSC with various tasks aimed at the efficient allocation of legal service resources, including (1) to "insure the maintenance of the highest quality of service and professional standards"; (2) to establish maximum income levels for individuals eligible for legal assistance and establish guidelines for measuring income levels; (3) to "insure that grants and contracts are made so as to provide the most economical and effective delivery of legal assistance to persons in both urban and rural areas"; and (4) to insure that legal services attorneys refrain from compensated outside law practice. 42 U.S.C. § 2996f.

LSC focuses on another of these administrative duties as the main source of its power to adopt the Final Rule. That provision, 42 U.S.C. section 2996f(a)(2)(C), discussed above, authorizes LSC to "insure that (i) recipients, consistent with goals established by the Corporation, adopt procedures for determining and implementing priorities for the provision of [legal] assistance."

This provision gets LSC nowhere in this lawsuit. As previously indicated, the clear meaning of the language is that it autho-

---

**3.** As LSC acknowledged by citing this language from *Brown* in adopting the regulation, 54 Fed. Reg. at 31955, this principle is appropriately applied to the private, congressionally-chartered LSC, which, like federal agencies, enacts rules in the manner prescribed by the Administrative Procedures Act, 5 U.S.C. § 553. *See National Clearinghouse*, 674 F.Supp. at 40 (APA standards are appropriate in reviewing LSC actions).

rizes LSC to set goals relating to the procedures by which LSC recipients set priorities, not to itself determine substantive case priorities. Any doubt about this interpretation is laid to rest by the cited Committee reports and by the fact, as indicated above, that Congress amended the statute in 1977 in a way that stressed the authority of local organizations to select their own cases.

Indeed, there is persuasive evidence that LSC itself previously adhered to the proper interpretation of section 2996f(a)(2)(C). At the time it adopted the challenged Final Rule, LSC already had regulations in place that implement section 2996f(a)(2)(C) consistent with the proper interpretation. Part 1620 of 45 CFR provides that "[t]he governing body of a recipient shall adopt procedures for establishing priorities in the allocation of its resources," section 1620.-2(a), and sets out guidelines for setting these procedures and priorities. The guidelines for setting priorities do not create substantive restrictions on types of cases but rather direct recipients, in selecting their own local priorities, to consider such factors as the legal needs of the local population, the availability of alternative sources of legal assistance, the susceptibility of particular problems to legal solutions, and whether particular legal efforts will produce "efficient and economic delivery of legal services." 45 CFR § 1620.2(b).

Now seeking to avoid this established interpretation of its authority, LSC argues that in eliminating redistricting litigation from the tools available in the program it is merely encouraging efficient use of resources to ensure that the policies set by Congress are achieved. *See* 54 Fed.Reg. 31954. Whether the Final Rule will in fact produce a more efficient delivery of legal services to the poor, which is sharply disputed, is basically beside the point. In eliminating redistricting cases from the

reach of recipients, LSC is supplanting the congressional mandate authorizing such litigation where local officials determine that it is a priority. If an agency charged with encouraging administrative efficiency can, in the name of efficiency, make decisions reserved by statute to others, the statutory scheme and underlying program will be frustrated and the congressional purpose undermined.

For example, suppose LSC decided that too many discrimination cases involved Spanish-speaking clients and that it was inefficient for recipients to recruit and hire Spanish-speaking employees because the expense outweighed the need to provide legal services to discrimination complainants and, in the name of efficiency, banned recipients from accepting discrimination cases. Or suppose LSC decided that landlord-tenant disputes, a basic component of recipient caseloads, were, for one reason or another, an inefficient use of recipient time and energy. At oral argument, counsel for LSC, claiming that LSC had full power over the substance of recipient caseloads, stated that the legal theory LSC urges in this litigation would indeed permit LSC to ban these or any other category of cases. But the authority to proscribe areas of practice was left by statute to Congress and local recipients, and LSC's powers in effecting efficiency do not permit usurpation of others' powers to determine what kinds of cases will be accepted.

As the record on which the Final Rule was adopted indicates, numerous LSC recipients across the country provide legal services on redistricting or census matters. There are also indications that these cases can provide substantial benefits to poor people and that without LSC recipient involvement some redistricting cases of potential value to the poor would not be brought.[4]

---

4. The rulemaking record consists almost entirely of (1) LSC recipients' responses to a 1984 LSC questionnaire—these responses reveal that many recipients have engaged in significant redistricting work; and (2) comments from recipients in response to publication as a proposed rule of what ultimately became the disputed

Final Rule—*these comments indicate overwhelming opposition to the redistricting ban and a widespread view, often backed by factual accounts, that redistricting and census cases can be a most efficient means of assisting the poor and that alternative sources of legal aid for such work are sometimes not available.*

Elections are a primary means for citizens to determine their futures. Redistricting cases are designed to insure that the electoral system is consistent with the intent of Congress and the framers of the Constitution. In a particular circumstance, a redistricting case might, in the judgment of local attorneys, be the single most important and efficient means of assisting the poor of a region. Although successful redistricting cases may benefit others besides the poor, so might other types of cases that LSC has not seen fit to ban, such as actions dealing with sanitation, landlord-tenant disputes, or consumer protection.

In short, it does not effectuate a congressional goal to eliminate one of the means Congress has allowed for achieving it.

■ Perhaps recognizing this fact, LSC suggests that the redistricting ban can be justified under another provision of the LSC Act, 42 U.S.C. § 2996f(b)(4), which prohibits "political activity." However, LSC's own regulations contain a part devoted to defining "Prohibited Political Activities," 45 CFR § 1608, and the definition contained therein covers political parties, campaign contributions, elections, and ballot referendums but specifically exempts from prohibition "any form of legal assistance to an eligible client, or. . . . fulfillment of any attorney's professional responsibilities to a client." Redistricting cases involve precisely such provision of legal services to a client; the object of such cases is to vindicate claimed statutory and constitutional voting rights.

■ In any case, much legal work on behalf of the poor, from consumer litigation to entitlements claims to the Voting Rights Act cases still permitted under the Final Rule, has political implications and the potential for stirring up controversy.[5] As LSC previously recognized in adopting the regulation cited above, there is no indication that Congress intended the "political activity" ban to give LSC carte blanche to prohibit certain types of cases. Where Congress wanted to prevent recipients from working in certain politically-charged areas, e.g. abortion and school desegregation, it specifically so provided.[6]

## Conclusion

LSC has no authority to second-guess clear legislative determinations Congress has affirmatively stated in the LSC Act. Congress can and in the past has made judgments about what types of cases are appropriate for LSC recipients. It has reserved these judgments for itself.

5. Amici point out that LSC's effort to draw a distinction between redistricting activities and other types of voting rights cases that remain permissible is somewhat problematic. For example, there are cases wherein the plaintiffs directly challenge an at-large electoral system but obtain a remedy other than redistricting. See, e.g., Dillard v. Town of Cuba, 708 F.Supp. 1244 (M.D.Ala.1988); Dillard v. Chilton County Bd. of Educ., 699 F.Supp. 870 (M.D.Ala.1988), aff'd mem., 868 F.2d 1274 (11th Cir.1989). Such cases appear to be permitted under the Final Rule but nevertheless might implicate the same concerns LSC has about redistricting cases. LSC recipients could bring this type of supposedly political case but would apparently be precluded from requesting redistricting as a remedy. See Memorandum on Behalf of Amici Curiae NAACP Legal Defense and Educational Fund, Inc., and Lawyers' Committee for Civil Rights Under Law, at 9–12. Presumably, if developments in a particular case convinced an LSC-funded attorney that it would best serve the client to seek leave to amend her complaint to request redistricting, she would have to withdraw from the case.

6. Subsequent to the adoption of the disputed Final Rule, Congress enacted the fiscal year 1990 LSC appropriations law, which neither ratified nor overruled the disputed Final Rule. As LSC notes, it is established that "once an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it was amended the statute in other respects, then presumably the legislative intent has been correctly discerned." United States v. Rutherford, 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (quoting Apex Hosiery Co. v. Leader, 310 U.S. 469, 487–89, 60 S.Ct. 982, 988–90, 84 L.Ed. 1311 (1940)). However, the enactment of an annual appropriations law does not rise to the level of a careful, comprehensive effort to amend the statute. If so, almost any agency regulation would be presumptively consistent with congressional intent if not overruled by the next appropriations law. Here, where the plain language of the statute and the committee reports completely undercuts LSC's position, it is not "realistic to infer approval of [LSC's] interpretation from congressional silence alone." Id.

888

There being no statutory authority for LSC to adopt the disputed Final Rule, it cannot be sustained.[7] Summary judgment is granted to plaintiffs and denied to LSC, and the Final Rule is declared invalid and enjoined. An appropriate Order is attached.

## ORDER

Upon consideration of plaintiffs' Motion for Summary Judgment, defendant's Motion to Dismiss or in the Alternative for Summary Judgment, the oppositions thereto, and the entire record herein, and for the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that defendant's Motion to Dismiss or in the Alternative for Summary Judgment is denied; and it is further

ORDERED that plaintiffs' Motion for Summary Judgment is granted; and it is further

DECLARED pursuant to 28 U.S.C. § 2201(a) that the regulation promulgated by defendant at 45 CFR Part 1632, 54 Fed.Reg. 31954 (Aug. 3, 1989) (the "Final Rule"), exceeds defendant's statutory rulemaking authority as provided in the Legal Services Corporation Act of 1974, as amended, 42 U.S.C. § 2996 et seq.; and it is further

ORDERED that defendant is permanently enjoined from enforcing the Final Rule; and it is further

ORDERED that plaintiffs are granted the costs of this action, to be fixed by the Clerk; and it is further

ORDERED that there being no indication of bad faith, plaintiffs' claim for attorney fees is denied.

---

7. Having concluded that the Final Rule exceeds LSC's rulemaking authority, the Court need not reach plaintiff's claims that (1) the Final Rule violates specific provisions of the LSC Act; (2) the Final Rule violates the First Amendment to the U.S. Constitution; and (3) the Final Rule lacks a rational basis and is arbitrary and capricious.